## UNITED STATES COURT OF INTERNATIONAL TRADE

---------------------------------------------------------------------X

RETRACTABLE TECHNOLOGIES, INC.,

         Plaintiff,

v.

UNITED STATES OF AMERICA;
OFFICE OF THE UNITED STATES TRADE
REPRESENTATIVE;
KATHERINE TAI TRADE REPRESENTATIVE;
UNITED STATES CUSTOMS & BORDER
PROTECTION; TROY MILLER, in his capacity as
Senior Official Performing the Duties of
Commissioner, U.S. Customs & Border Protection,

         Defendants.

---------------------------------------------------------------------X

Civil No. 24-00185

**DECLARATION OF THOMAS SHAW**

Thomas Shaw declares as follows pursuant to 28 U.S.C. § 1746:

  1.  I am the Founder and Chief Executive Officer of Retractable Technologies, Inc. ("Retractable"), Plaintiff in the above captioned matter.

  2.  This declaration is based on personal knowledge and is true and accurate to the best of my knowledge and recollection.

**A. My Background and Why I Founded Retractable Technologies in Little Elm, Texas**

  3.  I graduated from the University of Arizona with a degree in engineering.

  4.  I have a master's degree in accounting from the University of North Texas.

  5.  In the late 1980s, I watched a news program about a California doctor who had been infected with HIV after being stuck with a contaminated needle. The report went on to discuss healthcare workers contracting HIV and Hepatitis C due accidental needlestick injuries.

6. One of my oldest friends had recently been diagnosed with AIDS, and I decided to do something to help.

7. As a mechanical and structural engineer, I felt compelled to try to innovate new syringe technology that could all but eliminate accidental needlestick injuries.

8. I went to the nearest drugstore and bought dozens of syringes. After four years and more than 150 design changes, I developed an initial prototype for a new, innovative syringe.

9. I was awarded a $50,000 Small Business Innovation Research grant from the National Institute on Drug Abuse, a subsidiary of the National Institutes of Health (NIH), to further develop my design concepts.

10. This publicly funded research resulted in VanishPoint, a patented syringe with a retractable needle.

11. This groundbreaking innovation allows the needle to automatically retract after use, preventing needlestick injuries and helping curb the spread of infectious diseases.

12. I later received an additional $500,000 of NIH grant funding to commercialize VanishPoint and produce products for clinical trials.

13. This research and development led me to incorporate Retractable Technologies, Inc. in 1994.

14. We built a manufacturing facility in Little Elm, Texas, a Dallas–Fort Worth suburb on the shores of Lake Lewisville.

15. The then-mayor of Little Elm called it "the project of the century," with local officials pitching in hundreds of thousands of dollars for roads and other city improvements to prepare for the influx of jobs that would come with Retractable Technologies' new plant.

## B. Retractable's Work with the US Government on Public Health

16. Today, Retractable is a public company that has created thousands of high-paying American jobs since its inception.

17. The company currently holds the only effective technology to protect healthcare workers from contaminated needlestick injuries.

18. The U.S. Government depends on this technology for its efforts in deploying modern lifesaving technology, including during the COVID-19 pandemic.

19. During its efforts to deploy COVID-19 vaccinations, the United States government primarily relied on Retractable out of all its suppliers, due to the company's innovative technology and dependability.

20. Our patented technology allowed healthcare workers to withdraw additional doses from COVID-19 vaccine vials, accelerating the vaccination rollout by twenty percent.

21. From 2020 to the beginning of 2023, Retractable shipped over 700 million safety syringes.

22. During the same period, we received seven reports of contaminated needlestick injuries.

23. Our competitors' manual safety syringes, which are activated outside the body, dominate the market.

24. We estimate that their syringes have a contaminated needlestick injury rate of approximately one out of every *ten thousand* (1/10,000).

25. Today the number of contaminated needlesticks is estimated to be 380,000 per year, over 1,000 per day.

26. This is an increase from the year 2000, when the Needlestick Safety and Prevention Act was signed into law, even though the Act requires that healthcare employers use safety products that best minimize contaminated needlesticks.

27. Instead of being caused by non-safety syringes, today's contaminated needlestick injuries are being caused by ineffective safety syringes.

28. In collaboration with the U.S. Government and supported by both the Trump and Biden administrations through the Department of Defense and HHS/BARDA, Retractable expanded its Little Elm, Texas plant after a combined investment of over $138 million of Retractable's funds and American taxpayer dollars.

29. Government-funded machines allow Retractable to domestically produce safety vaccination syringes and needles in the event of a public health emergency.

30. However, the government machines do not give Retractable the ability to domestically produce all the product varieties Retractable Technologies sells to hospitals and other health providers in United States.

31. It will take many months to validate the molds and assembly machines for those products per FDA regulations and longer to ramp up production.

### C. Corporate Influence to Force Retractable Out of the Market

32. Despite Retractable's proven innovation and critical syringe technology that aids the American public at large, our company has been consistently undermined by Becton, Dickinson and Company ("BD"), the world's largest manufacturer of injection devices.

33. BD entered contracts with effectively all United States' GPOs, such that Retractable found it impossible to sell syringes into the United States hospital system.

34. With these and similar tactics, BD effectively shut down Retractable's attempts to get its patented, lifesaving syringes into major markets.

35. Because of BD's near-total control of syringe production in the U.S., Retractable has struggled to get bank loans or equity investments.

36. In fact, Retractable eventually sued BD and others in an anti-trust case that settled out of court.

### D. Retractable Ekes Out a Market Share, Benefitting Americans

37. In the early 2000s, BD's monopolistic efforts forced Retractable to choose between (1) declaring bankruptcy (which would have terminated hundreds of employees and allowed government funded technology to be buried), or (2) partnering with Chinese suppliers to exchange Retractable's innovative syringe technology for Chinese tooling and assembly technology that the company desperately needs to survive.

38. We were compelled to work with manufacturers in China, and we now rely on these key overseas partnerships to provide our innovative technology to the American public.

39. These relationships have allowed Retractable to survive despite BD's attempts to muscle Retractable Technologies out of major contracts.

40. With the help of these Chinese supply partners, Retractable survived over thirty years.

41. Having been pushed out of major hospital systems, Retractable managed to survive and eke out a small share of the syringe market with small contracts through government agencies, such as the Veteran's Administration, or other groups that negotiate directly with vendors (i.e. not through GPOs).

42. We also were able to sell into systems that lack resources and aren't large enough to interest GPOs, such as prisons and nursing homes.

43. We also license our technology to Chinese manufacturers, who pay royalties that come back into the United States to support Retractable Technologies and its approximately 200 employees.

44. Retractable's syringes sell at a price point of about one-third of what BD's pricing was before Retractable Technologies began bidding.

45. In other words, simply by existing in the marketplace, Retractable has caused BD to drop its prices by almost two-thirds per syringe.

46. This has benefitted the American public, even with Retractable's lifesaving syringes being pushed out of the hospital system.

47. Upon information and belief, BD would realize an extra one-billion dollars or more in profits annually were it to eliminate Retractable as a competitor, despite Retractable's miniscule market share.

48. BD also collaborates with Embecta Corp.

49. In 2022, BD spun off Embecta as a diabetes-focused medical device company.

50. Embecta continues to sell syringes and needles under the BD brand.

51. BD also collaborates with Cardinal Health.

52. Cardinal Health's syringes and needles under the Coviden brand and the Cardinal Health brand are number two in market share for hospitals after BD.

53. Cardinal Health is also one of the nation's largest healthcare distributors.

54. They distribute syringes and needles as well as other products for BD.

55. I am not aware of any comments made by Embecta or Cardinal Health to USTR on this tariff issue.

**E. Origin of the Syringe and Needle Tariff**

56. In 2018, the United States Trade Representative requested public comment regarding a proposal to impose a twenty-five percent tariff on several products imported from China, among them "Syringes, with or without their needles; parts and accessories thereof."

57. Retractable provided comments on May 9, 2018. A true and accurate copy of these comments is annexed hereto as **Exhibit A**.

58. In those comments, I explained how I developed and patented groundbreaking syringe technology in 1989 that allows the needle to automatically retract into the body of the syringe after an injection. I discussed how this technology virtually eliminates infectious disease spread caused by needlestick injuries.

59. The comments discuss that Congress passed the Needlestick Safety and Prevention Act of 2000 to encourage hospitals to use devices that would minimize needlesticks and spurred the safety syringe industry, and that this should have meant adoption of Retractable Technologies' syringes and thousands of high paying jobs American jobs.

60. However, I went on to explain how our efforts to sell the innovative lifesaving technology were stymied by BD blocking Retractable's access to more than ninety-five percent of the U.S. market, meaning healthcare workers in United States were unnecessarily exposed to bloodborne pathogens, such as HIV, HBV, HCV, or HI related flu viruses.

61. I further explained why banks and investors deny commercial capital or loans and equity investments to Retractable because they know that the medical device industry is blocked to new competitors by a few large manufacturers.

62. They understand that the normal incentives to reduce costs at hospitals are distorted because of reimbursement payments and kickbacks to GPOs, who make money when costs are inflated.

63. My comments described in detail how a twenty-five percent tariff passed without investigation into these issues would be arbitrary and capricious and would crush Retractable's ability to supply the American public with life-saving syringes.

64. That was May 2018, and I related the company's conversations with federal health officials that characterized a pandemic flu event as "virtually inevitable," a matter of "*when, not if*," leading to a heightened national security and public health need to support Retractable's innovative work in the syringe market.

65. Based on these comments, USTR removed syringes and needles from the proposed tariff.

66. The history speaks for itself: Retractable's syringes played a pivotal role in America's successful response to the 2020 COVID-19 pandemic.

### F. Corporate Influence and Revival of the Syringe and Needle Tariff

67. We are aware that BD's Chief Executive Officer Tom Polen has ties with Secretary of Commerce Gina Raimondo and has had conversations with Monica Gorman, Special Assistant to the President for Manufacturing & Industrial Policy at the National Economic Council in the White House.

68. Indeed, Mr. Polen serves on Secretary Raimondo's Advisory Committee on Supply Chain Competitiveness

69. Based on an August 2023 meeting held by the Department of Commerce Advisory Committee on Supply Chain Competitiveness, we understood that Mr. Polen had spoken to the Department of Commerce regarding a syringe and needle tariff.

70. Mr. Polen all but confirmed this during a January 2024 interview on CNBC's "Mad Money" with host Jim Cramer, in which he noted his work with Secretary Raimondo and their concerns with the making sure "the U.S. is secure from a supply chain perspective."

71. He went on to tout BD's ability to manufacture locally without relying on imports.

72. BD has since asked USTR to put a tariff on syringes and needles at the highest rate possible.

73. Coalition for a Prosperous America, who I on information and belief understand to be a consultant to BD, has asked USTR to put a tariff on $1 per syringe or higher.

74. $1 far exceeds the price Retractable Technologies sells its syringes, not to mention the cost to make a syringe.

75. As a result of these efforts, we believe the Department of Commerce urged President Biden to impose a tariff on syringes and needles during a four-year statutory review of the Section 301 tariffs.

76. Indeed, USTR's recommendation to President Biden to impose a tariff on needles and syringes utterly surprised Retractable because at no point did we understand that USTR was intending to expand tariffs to needles and syringes.

77. Instead, USTR apparently made the decision after publishing a vague notice in March of 2024 seeking comment on "supply chain resilience." (BD provided comments, urging enactment of "industrial policy" and the use of Section 301 tariffs for syringes and drug delivery devices).

78. Regardless, on May 14, 2024, President Biden issued a Memorandum on Actions by the United States Related to the Statutory 4-Year Review of the Section 301 Investigation of China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation (the "Memorandum"). The Memorandum was issued on the same day that USTR released its four-year Section 301 review that recommended modification to add tariffs on syringes and needles.

79. The Memorandum states: "For personal protective equipment (facemasks, medical gloves, and syringes and needles), the Trade Representative is directed to increase rates of duty to ... 50 percent in 2024." Notably, syringes and needles are *not* personal protective equipment.

80. As stated in the accompanying declaration of our project manager, Woot Lervisit, he was repeatedly told by various federal agencies it was too late to contest a tariff and that USTR did not believe that it needed to consult with domestic industry representatives on the issue.

81. When USTR extended the hearings and period for comments about supply chain resiliency, Retractable Technologies did provide comments to USTR on June 4, 2024, explaining the tariff would crush BD's only real competitor, destroying hundreds of American jobs, shelving government funded lifesaving syringe technology, and harming the American public.

82. However, by this time it was clear that USTR, following the President's directive, was unlikely to remove syringes and needles from the ad valorem tariff expansion.

83. On September 13, 2024, USTR announced a one hundred percent tariff on needles and syringes imported from China, to become effective September 27, 2024.

G. **The Proposed Tariff Will Destroy Retractable Technologies**

84. USTR's one hundred percent tariff in 2024 on needles and syringes from China now threatens to push us from the market completely.

85. No USTR personnel consulted with Retractable about the tariff rate or effective date before deciding to impose this draconian tariff.

86. If USTR had done so, it would have realized that the tariffs in 2024 would crush our company, waste government-funded technology, and deprive the American public of our critical syringe and needle technology, which has been a lynchpin of the U.S. Government's efforts to dispense vaccines in public health crises.

87. In short, this decision undermines the supposed purpose of promoting supply chain resilience while putting our American company out of business.

88. Presently, approximately $522,700 of Retractable's syringes and needles are on the water from China expected to arrive in U.S. ports in October subject to a 100% tariff rate.

89. The 100% tariff rate would force Retractable to sell some of these syringes and needles at a loss.

90. To be competitive in the U.S. syringe and needle market, Retractable must sell syringes and needles that it does not have equipment to make in the U.S.

91. In the coming months, we aim to enhance our existing equipment to produce significantly more of our products domestically.

92. We will need to continue importing goods from China in the short-term to meet our obligations to our healthcare provider customers.

93. Retractable Technologies cannot afford to pay 100% tariffs in 2024 and be competitive.

94. No anticipated rise in demand will offset the adverse effects of the tariff.

95. Retractable may have no choice but to cut overhead (i.e. fire employees) in a desperate attempt to keep the business afloat until it can find a solution.

96. The USTR's decision to impose a syringe and needle tariff will likely result in layoffs of Retractable employees.

97. The 100% tariff effective September 27, 2024 complicates Retractable's competitive position in 2024 and beyond.

98. This chain of events will almost certainly trigger a death spiral for the company.

99. Retractable shutting down means the government's and Retractable's more than $138 million investment into our machinery will go to waste.

100. The American public will be left with lower quality syringes and needles that do not possess our critical technology.

101. Healthcare providers and the government will likely be paying unconscionably high prices for those lower quality syringes and needles.

102. If this Court does not stop the USTR's tariff from going into effect in 2024, the company I founded almost thirty years ago in Little Elm, Texas will likely die, and so will its promise to create hundreds of high paying American jobs to deliver lifesaving and cost saving technology to our healthcare system.

103. Even an effective date in 2025 with 50% rate would allow Retractable to move production to the United States and provide financial stability for the company to be a part of a resilient supply chain.

104. Without Court intervention, I will likely lose my company. But I believe the biggest losers will be the American people.

I declare under penalty of perjury that the above is true and correct.

Executed on this 25 day of September 2024

                                                                  Thomas Shaw