**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| RETRACTABLE TECHNOLOGIES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA; OFFICE ) | |
| OF THE UNITED STATES TRADE ) | |
| REPRESENTATIVE; KATHERINE TAI ) | Court No. 24-00185 |
| TRADE REPRESENTATIVE; UNITED ) | PUBLIC VERSION |
| STATES CUSTOMS & BORDER ) | |
| PROTECTION; TROY MILLER, in his ) | |
| capacity as Senior Official Performing the ) | |
| Duties of Commissioner, U.S. Customs & ) | |
| Border Protection, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' MOTION TO DISMISS AND  OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

OF COUNSEL

MEGAN M. GRIMBALL
PHILIP A. BUTLER
Associate General Counsel
Office of the United States Trade
Representative

EMMA L. TINER
Attorney
International Trade Litigation
Office of the Assistant Chief Counsel
U.S. Customs and Border Protection

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

EMMA E. BOND
Senior Trial Counsel
U.S. Department of Justice, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-2034
Email: Emma.E.Bond@usdoj.gov

October 15, 2024

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

ISSUES ............................................................................................................... 2

FACTS AND PROCEDURAL HISTORY ......................................................... 3

    A.    The Trade Representative Takes Action Under Section 301 To Obtain The Elimination Of China's Unfair Trade Practices ............................................. 3

    B.    During The COVID-19 Pandemic, The United States Invests In Supply Chain Resilience for Essential Medical Supplies, Including Needles And Syringes ............... 5

    C.    After Receiving Requests To Continue The Action, The Trade Representative Seeks Public Comment On The Effects of the Tariff Actions on the U.S. Economy, And Section 301 Actions That Could Be Taken Against Other Products Or Services .. 6

    D.    After Inter-Agency Review And Evaluation Of Public Comment, The Trade Representative Submits A Report On The Four-Year Review To The President .......... 8

    E.    The President Directs The Trade Representative To Modify The Actions— Including By Imposing A Minimum 50 Percent Tariff On Needles And Syringes ....... 9

    F.    The Trade Representative Provides An Opportunity To Comment On The Proposed Modifications  And Retractable Files A Comment ....................................... 10

    G.    The Trade Representative Modifies The Section 301 Actions, Imposing Additional Tariffs On Syringes And Needles ................................................................... 12

    H.    Retractable Files Suit And Seeks To Preliminarily Enjoin Collection Of Section 301 Duties On Millions Of Dollars Of Imports From China ....................................... 13

SUMMARY OF ARGUMENT ...................................................................... 14

ARGUMENT ................................................................................................... 15

    I.    Retractable's Complaint Should Be Dismissed Pursuant To Rules 12(b)(6) And 12(b)(6) ................................................................................................. 15

    A.    Standards Governing Motions To Dismiss Pursuant To Rule 12(b)(1) and 12(b)(6) ............................................................................................................. 15

    B.    This Court Does Not Possess Jurisdiction To Review The President's Exercise Of Discretion To Direct The Trade Representative To Add Tariffs Of At Least 50 Percent On Syringes And Needles ................................................................... 16

    C.    Retractable Fails To State A Claim That The Trade Representative Failed To Rationally Implement The President's Direction Or Comply With Statutory Procedures ................ 20

       1.    Retractable Has Not Stated A Claim That The Trade Representative Failed To Consult With The Domestic Industry Concerned Pursuant To 19 U.S.C. § 2417(a)(2) ........................................................................................................ 20

       2.    Retractable Has Not Stated A Claim That The Trade Representative's Implementation Of The President's Directive Was Arbitrary And Capricious .................................... 25

II.    Retractable's Request For A Preliminary Injunction Should Be Denied .................... 27

A.    Standard of Review For Granting Injunctive Relief .................................................... 27

B.    Plaintiff Has Failed To Demonstrate Immediate, Irreparable Harm ................................ 28

    1.    Retractable Faces No Irreparable Harm From Liquidation ........................................ 29

    2.    Retractable Faces Nothing More Than Potential Economic Loss If Required To Pay Applicable Section 301 Duties ............................................................................ 30

C.    Retractable Fails To Establish Likelihood of Success On The Merits ........................ 34

    1.    Retractable Misunderstands The Nature Of The Section 301 Inquiry ........................ 35

    2.    The Trade Representative Consulted With Domestic Industry .................................... 36

    3.    The APA Does Not Apply And, Even If It Did, The Trade Representative Responded To Significant Comments .......................................................................... 37

D.    The Balance Of Hardships And Public Interest Favor Denial .................................... 40

E.    USCIT Rule 65(c) Security Is Required ........................................................................ 42

CONCLUSION ...................................................................................................................... 43

# TABLE OF AUTHORITIES

## Cases

*Am. Ass'n of Exps. & Imps.*,
   751 F.2d ................................................................................................ 38

*Am. Inst. for Imported Steel, Inc. v. United States*,
   8 CIT  (1984) ...................................................................................... 28

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001) ......................................................... 28

*Arbaugh v. Y & H Corp.*,
   546 U.S. 500 (2006) ........................................................................... 16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................... 16

*Asociacion Colombiana de Exportadores de Flores v. United States*,
   13 CIT 584 (1989) .............................................................................. 28

*Axiom Res. Mgmt., Inc. v. United States*,
   564 F.3d 1374 (Fed. Cir. 2009) ......................................................... 28

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................... 16

*Bell/Heery v. United States*,
   106 Fed. Cl. 300 (2012), *aff'd* 739 F.3d 1324 (2014) ...................... 16

*Cedars-Sinai Med. Ctr. v. Watkins*,
   11 F.3d 1573 (Fed. Cir. 1993) ........................................................... 15

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012) ........................................................... 32

*Chilean Nitrate Corp. v. United States*,
   11 C.I.T. 538 (1987) .......................................................................... 31

*City of Waukesha v. EPA*,
   320 F.3d 228 (D.C. Cir. 2003) .......................................................... 39

*Corus Grp. PLC. v. Int'l Trade Commn*,
   352 F.3d 1351 (Fed. Cir. 2003) ................................................... 17, 19

*Engage Learning, Inc. v. Salazar*,
   660 F.3d 1346 (Fed. Cir. 2011) ......................................................... 15

*FCC v. Schreiber*,
   381 U.S. 279 (1965) ..................................................................................... 24

*FMC Corp. v. United States*,
   3 F.3d 424 (Fed.Cir.1993) ........................................................................... 34

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ..................................................................................... 23

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ............................................................................... 17, 19

*Gilda Indus., Inc. v. United States*,
   622 F.3d 1358 (Fed. Cir. 2010) ................................................................... 21

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021) ....................................................................... 23

*In re Section 301 Cases*,
   524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021) ......................................... 27, 29

*In re Section 301 Cases*,
   570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) ......................................... 18, 38

*In re Section 301 Cases*,
   628 F. Supp. 3d 1235 (Ct. Int'l Trade 2023) ............................................... 39

*Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ..................................................................................... 34

*Invenergy Renewables LLC v. United States*,
   476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) ............................................... 37

*Manhattan Shirt Co. v. United States*,
   2 CIT 270 (1981) ......................................................................................... 28

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ..................................................................................... 27

*Michael Simon Design, Inc. v. United States*,
   609 F.3d 1335 (Fed. Cir. 2010) ................................................................... 17

*Munaf v. Geren*,
   553 U.S. 674 (2008) ..................................................................................... 27

*Nken v. Holder*,
   556 U.S. 418 (2009) ..................................................................................... 40

*Norsk Hydro Can., Inc. v. United States,*
   472 F.3d 1347 (Fed. Cir. 2006) ................................................................ 15

*Norton v. S. Utah Wilderness,*
   *All.*, 542 U.S. 55 (2004) ........................................................................ 28

*Queen's Flowers de Colombia v. United States,*
   947 F. Supp. 503 (Ct. Int'l Trade 1996) ................................................. 31

*Retractable Techs., Inc. v. Becton Dickinson & Co.,*
   842 F.3d 883 (5th Cir. 2016) ................................................................... 33

*S.J. Stile Assocs. Ltd. v. Snyder,*
   646 F.2d 522 (C.C.P.A. 1981) ................................................................ 29

*Sampson v. Murray,*
   415 U.S. 61 (1974) ................................................................................... 33

*Shakeproof Indus. Prods. Div. of Ill. Tool Works, Inc. v. United States,*
   104 F. 3d 1309 (Fed. Cir. 1997) ....................................................... 20, 34

*Shree Rama Enterprises v. United States,*
   983 F. Supp. 192 (Ct. Int'l Trade 1997) ............................... 30, 31, 32, 34

*Silfab Solar, Inc. v. United States,*
   892 F.3d 1340 (Fed. Cir. 2018) .............................................................. 28

*Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.,*
   74 F.3d 1216 (Fed. Cir. 1996) ................................................................ 28

*Solar Energy Indus. Ass'n v. United States,*
   86 F.4th 885 (Fed. Cir. 2023) ........................................................... 17, 18

*Solar Energy Indus. Ass'n v. United States,*
   111 F.4th 1349 (Fed. Cir. 2024) ............................................................ 22

*Sumecht NA, Inc. v. United States,*
   923 F.3d 1340 (Fed. Cir. 2019) ........................................................ 28, 30

*USP Holdings, Inc. v. United States,*
   36 F.4th 1359 (Fed. Cir. 2022) .............................................................. 17

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
   435 U.S. 519 (1978) ................................................................................ 24

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .................................................................................... 27

*Zenith Radio Corp. v. United States*,
  710 F.2d 806 (Fed. Cir. 1983) .......................................................................... 28, 29

<u>Statutes</u>

5 U.S.C. § 553(a)(1) ............................................................................................. 37, 38

5 U.S.C. § 706 ...................................................................................................... 20, 35

19 U.S.C. § 1581(i) .............................................................................................. 17

19 U.S.C. § 1872 .................................................................................................. 8

19 U.S.C. § 2155 .................................................................................................. 9, 21, 36

19 U.S.C. § 2411 .................................................................................................. passim

19 U.S.C. § 2412 .................................................................................................. 23

19 U.S.C. § 2413(a)(3) .......................................................................................... 21

19 U.S.C. § 2416 .................................................................................................. 21, 23

19 U.S.C. § 2417 .................................................................................................. passim

19 U.S.C. § 2714(a) .............................................................................................. 25

28 U.S.C. § 1581(i) .............................................................................................. 17, 20, 34

28 U.S.C. § 2640(e) .............................................................................................. 17

42 U.S.C. § 247d .................................................................................................. 5

42 U.S.C. § 5149 .................................................................................................. 5, 6

50 U.S.C. § 4501 .................................................................................................. 5

<u>Rules</u>

USCIT Rule 65(c) ................................................................................................. 42

<u>Regulations</u>

15 C.F.R. § 2002.0 ................................................................................................ 8

15 C.F.R. § 2002.2 ................................................................................................ 8

15 C.F.R. § 2002.3 ................................................................................................ 8

15 C.F.R § 2002.3 (b)(2-4) (2022) ....................................................................... 8

Other Authorities

78 FR 76.589 .................................................................................................................. 26

*Notice of Action and Request for Public Comment Concerning Proposed Determination of
Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology
Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (Jun. 20, 2018) ............. 3

*Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to
Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823 (Aug. 16,
2018) ............................................................................................................................. 4

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices
Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 43,304
(Aug. 20, 2019) ................................................................................................................ 4

87 FR 26,797 ................................................................................................................... 6

83 FR 47,974 ................................................................................................................... 4

87 FR 55,073 ................................................................................................................ 6, 7

87 FR 62,914 ........................................................................................................... passim

H.R. Rep. No. 79-1980 .................................................................................................... 16

Executive Order 11846 ..................................................................................................... 8

Executive Order 14001 ..................................................................................................... 5

Executive Order 14017 .............................................................................................. 5, 7, 23

INTRODUCTION

This case relates to tariffs imposed under Section 301 of the Tariff Act of 1974, to obtain the elimination of China's unfair technology-transfer practices that burden the United States commerce. *See* 19 U.S.C. § 2411. In May 2024, the President directed the United States Trade Representative to modify the original section 301 action by adding tariffs on hundreds of products—including tariffs of at least 50 percent on needles and syringes. After engaging in inter-agency review and considering public comment, the Trade Representative issued a modification consistent with the President's direction, imposing tariffs of 100 percent on Harmonized Tariff Schedule of the United States (HTSUS) subheadings 9018.31.00 and 9018.32.00, covering syringes and needles.

Retractable Technologies, Inc. (Retractable) now seeks to enjoin the collection of tariffs on needles and syringes it imported from China. Retractable does not challenge the overall decision to modify the section 301 actions, but contends the Trade Representative lacked authority to impose duties on needles and syringes specifically. There is no merit to Retractable's claims. Once the modification criteria are met, the Trade Representative may take any "appropriate and feasible" action authorized by section 301, including imposing duties on Chinese goods "without regard to" whether they were "involved in" the investigated unfair practices. 19 U.S.C. § 2411(b), (c)(2). Thus, whether duties on specific products are "appropriate and feasible" is a discretionary decision delegated to the Trade Representative— subject to the President's direction. Retractable provides no basis for second-guessing that decision in this case. At the preliminary injunctive posture, moreover, Retractable fails to show that any of the equitable factors support allowing it to import millions of dollars in merchandise into the United States without paying duties.

<u>ISSUES</u>

1.      Whether Retractable's complaint should be dismissed pursuant to Rule 12(b)(1) and 12(b)(6).

       A.      Whether the Court lacks jurisdiction to review the President's direction to the Trade Representative to modify the Section 301 actions by adding a tariff on needles and syringes.

       B.      Whether Retractable has failed to state a claim for relief regarding the Trade Representative's implementation of the President's direction and consultation with representatives of the domestic industry concerned with the section 301 action.

2.      Whether Retractable has failed to demonstrate entitlement to preliminary injunctive relief.

       A.      Whether Retractable has failed to establish concrete, imminent, and irreparable harm from paying the applicable section 301 duties during the pendency of this case.

       B.      Whether Retractable is unable to demonstrate likelihood of success on the merits of its challenge to the imposition of section 301 tariffs on needles and syringes.

       C.      Whether balancing of the equities and the public interest support denying the request for injunctive relief, which would undercut the purpose of the section 301 actions to eliminate China's unfair trade practices that burden the U.S. economy.

3.      Alternatively, if the Court orders preliminary injunctive relief, whether Retractable must post a bond to protect the United States from the loss of revenue, as required by Rule 65(c).

FACTUAL AND PROCEDURAL HISTORY[1]

A.    The Trade Representative Takes Action Under Section 301 To Obtain The Elimination Of China's Unfair Trade Practices

On August 18, 2017, the Trade Representative initiated a section 301 investigation into China's acts, policies, and practices related to technology transfer.  *See Four-Year Review of Actions Taken in the Section 301 Investigation* at 3 (U.S. Trade Representative, May 14, 2024) (Ex. 16).  After finding that the investigated practices were unreasonable or discriminatory and burdened U.S. Commerce, the Trade Representative took "appropriate and feasible action . . . to obtain the elimination" of the unfair practices, as directed by the President.  *See* 19 U.S.C. § 2411.  Among other tools at its disposal, the Trade Representative is authorized to "impose duties or other import restrictions on the goods of" the investigated country "for such time as the Trade Representative determines appropriate."  19 U.S.C. § 2411(C)(1)(B).  This action may be taken against any goods from the foreign country (here, China) "without regard to whether or not such goods or economic sector were involved in the act, policy, or practice that is the subject of" the section 301 action.  19 U.S.C. § 2411(c)(2).

In June 2018, the Trade Representative determined to impose duties of 25 percent on a list of 818 tariff headings (List 1), representing an approximate annual trade value of $34 billion.[2]  Ex. 16 at 4.  In August 2018, the Trade Representative imposed additional duties on another list of 279 tariff subheadings (List 2), representing an approximate annual trade value of

---

[1]  The cited exhibits are attached to the brief.

[2]  *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (U.S. Trade Representative Jun. 20, 2018).

$16 billion.[3]  Ex. 16 at 5.  Collectively, the List 1 and List 2 actions covered nearly 1,100 tariff subheadings.[4]

After the Trade Representative took action under section 301, China retaliated by engaging in defensive actions—including imposition of approximately $50 billion in tariffs on U.S. goods— "to maintain" its unfair practices regarding technology transfer.[5]  In light of China's defensive measures—and the resulting increased burden and harm to the U.S. economy—the Trade Representative modified the section 301 action as specifically directed by the President.  In September 2018, at the President's direction, the Trade Representative announced additional duties on a list of 5,745 tariff subheadings (List 3), with an approximate trade value of $200 billion (List 3).  Ex. 16 at 5.

In August 2019, at the direction of the President, the Trade Representative announced the further modification of the section 301 action by imposing duties on a list of 3,782 tariff subheadings (List 4)—with an annual trade value of approximately $300 billion.  Ex. 16 at 6.[6] List 4 was to be implemented in two segments, with List 4A to take effect on September 1, 2019 (List 4A) and List 4B to take effect on January 1, 2020 (List 4B).  Ex. 16 at 6.  Although the additional tariff rate was originally set at 10 percent, the Trade Representative later increased the tariff to 15 percent, at the President's direction.  Ex. 16 at 6.

---

[3]  *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823 (U.S. Trade Representative Aug. 16, 2018).

[4]  This calculation refers to the 8-digit subheadings of the HTSUS.

[5]  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974 (Sep. 21, 2018)

[6]  *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 43,304 (U.S. Trade Representative Aug. 20, 2019).

List 4 was further modified after the United States and China announced a trade deal in January 2020—the Economic and Trade Agreement Between the Government of the United States of America and the Government of the People's Republic of China.  Ex. 16 at 6.  At the specific direction of the President, the Trade Representative suspended the tariffs in List 4B in December 2019, and reduced the tariffs in List 4A from 15 percent to 7.5 percent in January 2020.  Lists 1 through 4—imposed from 2018 to 2020—collectively covered an approximate trade value of $550 billion and spanned approximately 11,000 of the more than 11,400 8-digit subheadings in the Harmonized Tariff Schedule of the United States.[7]

B.    During The COVID-19 Pandemic, The United States Invests In Supply Chain Resilience for Essential Medical Supplies, Including Needles And Syringes

The COVID-19 pandemic revealed vulnerabilities in domestic supply chains.  On February 21, 2021, the President issued an Executive Order recognizing that "[p]andemics and other biological threats . . . can reduce critical manufacturing capacity and the availability and integrity of critical goods, products, and services."  Exec. Order No. 14017, 86 Fed. Reg. 11,849 (Feb. 24, 2021) (Ex. 8).  Thus, "the 'United States needs resilient, diverse, and secure supply chains to ensure our economic prosperity and national security.'"  Ex. 16 at 87 (citing Exec. Order 14017).  The Executive Order directed the Secretary of Health and Human Service to submit a report identifying risks in the supply chain for pharmaceuticals and active pharmaceutical ingredients.[8]

---

[7]    *See* The 2024 Harmonized Tariff Schedule of the United States (HTS) Item Count, U.S. International Trade Commission, available at https://www.usitc.gov/tariff_affairs/documents/2024_hts_item_count.pdf (last visited Oct. 11, 2024); *see also* Harmonized Tariff Information, U.S. International Trade Commission, https://www.usitc.gov/harmonized_tariff_information (last visited Oct. 11, 2024).

[8]    In Executive Order 14001, the President further directed "immediate actions to secure supplies necessary for responding to the pandemic, so that those supplies are available, and remain available[.]"  Exec. Order 14001, 86 Fed. Reg. 7,219 (Jan. 21, 2021) (Ex. 7) (citing

The resulting report, issued in June 2021, made key findings regarding the supply chains of four critical products, including pharmaceuticals and active pharmaceutical ingredients. *See Building Resilient Supply Chains, Revitalizing American Manufacturing, and Fostering Broad-Based Growth, 100-Day Reviews under Executive Order 14017* at 233 (Dep't of Commerce, Dep't of Energy, Dep't of Defense, Dep't of Health & Human Servs., June 2021) (Ex. 10). The report described that one of the efforts taken to improve supply chain resilience was to "monitor the availability and supply of critical medical products—including select personal protective equipment, pharmaceuticals, new COVID-19 therapeutics, point-of-care tests, *and needles and syringes*." Ex. 10 at 233 (emphasis added).

As part of its efforts to secure necessary supplies and ensure resilient supply chains, the Federal Government invested in domestic manufacturing of needles and syringes. For example, the Center for the Biomedical Advanced Research and Development Authority (BARDA)—part of the Department of Health and Human Services—collaborated with the Department of Defense to expand domestic manufacturing capacity for needles and syringes. *See* BARDA Press Release Becton Dickinson (July 9, 2020) (Ex. 5); BARDA Press Release Retractable (July 9, 2020) (Ex. 6); Dep't of Defense Press Release (May 21, 2021) (Ex. 9) (showing investment in domestic manufacturing of needles and syringes by Retractable and Becton Dickinson). Among other investments, BARDA and the U.S. Department of Defense established a "Technology Investment Agreement" to expand Retractable's "manufacturing capacity to produce safety needles and syringes in the United States." Ex. 6 at 1. The Government allocated $27.3 million

_____

Defense Production Act of 1950, as amended (50 U.S.C. 4501 et seq.), sections 319 and 361 of the Public Health Service Act (42 U.S.C. 247d and 264), sections 306 and 307 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5149 and 5150), and section 301 of title 3, United States Code).

in funding as "part of the interagency effort to ensure timely availability of medical resources essential for national defense." Ex. 9 at 2.

C.    After Receiving Requests To Continue The Action, The Trade Representative Seeks Public Comment On The Effects Of The Tariff Actions On The U.S. Economy, And Section 301 Actions That Could Be Taken Against Other Products Or Services

On May 5, 2022, the Trade Representative commenced the statutory four-year review of the section 301 actions..[9]  "The first phase" of this process was notifying representatives of domestic industries that benefited from the section 301 actions of the possible termination of those actions and the opportunity to request continuation.  *See* Ex. 11 at 3.  The Trade Representative received "numerous requests to continue" the 301 actions..[10]  Thus, the Trade Representative determined that the Section 301 actions "did not terminate on their four-year anniversary dates (July 6, 2022 and August 23, 2022)" and would remain in effect.  Ex. 12 at 3.

In light of the continuation of the section 301 actions, the Trade Representative announced that it would "conduct a review" of the section 301 actions as required by 19 U.S.C. § 2417(c)(3).  Ex. 12 at 3.  Under this provision, the Trade Representative reviews (1) "the effectiveness [of the action] in achieving the objectives of section 2411," (2) the effectiveness of "other actions that could be taken"—including "actions against other products or services," and (3) the effects of the actions on the United States economy, including consumers.  19 US.C. § 2417(c)(3).

---

[9]  *Initiation of Four-Year Review Process: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 26,797 (U.S. Trade Representative, May 5, 2022) (Ex. 11).

[10]  *Continuation of Actions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 55,073 (U.S. Trade Representative, Sept. 8, 2022) (Ex. 12).

In October 2022, the Trade Representative issued a Federal Register notice seeking public comment on all three areas required by the statute..[11]  The Trade Representative also invited opinions on "the effects of the [section 301] actions on U.S. supply chain resilience," and on "critical supply chains outlined in Executive Order 14017 and in subsequent reports and findings."  Ex. 13 at 4.  The Trade Representative also requested comments regarding potential "actions against other products or services."  Ex. 13 at 3.

Retractable did not submit a comment.  Another producer of needles and syringes, Becton Dickinson, filed comments requesting that certain rubber components used in the manufacturing of syringes no longer be subject to section 301 duties, noting that the finished product—syringes—was not.  Becton Dickinson Comment at 12, USTR-2022-0014-00035324 (Jan. 17, 2023) (Ex. 14).  Becton Dickinson identified tariff subheading "9018.31.00 (syringes/medical delivery system)" as one of the subheadings for the finished product.  *Id.* According to Becton Dickinson, this created "a disincentive for Companies to maintain U.S. assembly and production of these essential healthcare products[.]"  *Id.* at 12.

D.     After Inter-Agency Review And Evaluation Of Public Comment, The Trade Advises the President On The Findings Of The Four-Year Review To The President

In 2023 and early 2024, the Trade Representative and the Section 301 committee reviewed the effectiveness of the Section 301 action, other actions that could be taken, and the other statutory criteria.  Ex. 16 at 7, 10.  The Section 301 committee is an inter-agency body that is subordinate to the Trade Policy Staff Committee, 15 C.F.R. §§ 2002.3, 2002.2, which is subordinate to the Trade Policy Committee, 15 C.F.R. § 2002.0.  The Trade Policy Committee,

---

[11]  *Request for Comments in Four-Year Review of Actions Taken in the Section 301 Investigation: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 62,914 (U.S. Trade Representative, Oct. 17, 2022) (Ex. 13) (citing 19 U.S.C. § 2417(c)(3)).

in turn, arises from the President's obligation to "establish an interagency organization" to (among other things) "assist the President, and advise the Trade Representative, with respect to the development and implementation of the international trade policy objectives of the United States" 19 U.S.C.A. § 1872; *see also* Trade Expansion Act of 1962, § 242, as amended; Executive Order 11846, ¶ 3 (establishing the Trade Policy Committee).[12]

The Section 301 Committee reviewed (1) the extent to which the Section 301 actions have "been effective" in bringing about the elimination of China's technology transfer-related activities, (2) the effects of the Section 301 actions on the U.S. economy, and (3) "possible modifications to the actions and how those possible modifications would affect the U.S. economy." Ex. 16 at 7; *see also* Ex. 16 at 92-118 (Appendix A to report containing description of written comment). As part of this review process, the Trade Representative also undertook consultations with the private sector advisory committees established under Section 135 of the Trade Act of 1974 throughout 2023 and 2024. *See* 19 U.S.C. § 2155.

On May 13, 2024, after review with the Section 301 committee and considering public comment, the Trade Representative advised the President on the findings of the review and recommended maintaining current duties and modifying the section 301 action by adding or increasing tariffs for certain products in fourteen "strategic sectors." Ex. 16 at 87-88. These included sectors "targeted by China for dominance" or sectors "where the U.S. has recently made

---

[12]   As a subordinate entity from the Trade Policy Committee, the Section 301 Committee is comprised of trade experts from, among other agencies, the Departments of Agriculture, Commerce, Defense, Labor, State, Treasury, the Small Business Administration, and U.S. Customs and Border Protection. The function of the committee includes receiving views concerning foreign restrictions, acts, policies, and practices affecting U.S. commerce, and United States actions in response thereto through public hearings or otherwise, and to provide recommendations to the Trade Representative on such matters. *See* 15 C.F.R § 2002.3 (b)(2-4) (2022).

significant investments." Ex. 16 at 88. Among other significant Government investments, the Trade Representative highlighted "recent investments to increase domestic production" of "critical medical supplies." Ex. 16 at 89. Regarding "critical medical supplies", the Trade Representative explained that "[i]ncreasing the section 301 duties on critical medical supplies, … will help protect recent investments to increase domestic production and U.S. preparedness and as a result of those investment, the United States has, or is expected to have, sufficient domestic capacity." Ex. 16 at 85.

Among the fourteen strategic sectors or product categories list were "syringes and needles." The Trade Representative explained that needles and syringes are "critical to U.S. preparedness and responses to public health emergencies" and "increasing section 301 duties on syringes and needles . . . will help maintain alternative sources" of supply. Ex. 16 at 85.

E.    The President Directs The Trade Representative To Modify The Actions—Including By Imposing A Minimum 50 Percent Tariff On Needles And Syringes

After considering the Trade Representative's findings, the President issued a Memorandum directing the Trade Representative to continue existing duties and modify the section 301 action for certain specified categories of products from China. *Memorandum on Actions by the United States Related to the Statutory 4-Year Review of the Section 301 Investigation of China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation* (May 14, 2024) (Ex. 15). Although the Section 301 actions had "been effective in encouraging China to take positive steps" in addressing the underlying unfair trade practices regarding technology transfer, China "continue[d] to aggressively attempt to acquire and absorb foreign technology and intellectual property." *Id.* at

2. This added "to the burden or restriction on United States Commerce." *Id.*[13]  The President found that "additional section 301 tariffs would provide further incentives for China to eliminate the acts, policies, and practices at issue." *Id.*

Thus, the President directed the Trade Representative to maintain the existing tariffs and to "modify" the actions by increasing Section 301 duties for specified categories of products from China, including syringes and needles, at specific time periods and rates. *Id.* at 3.  For syringes and needles, the President directed the Trade Representative to increase the duty rate to "no less than" 50 percent in 2024. *Id.* at 3.  The President further directed the Trade Representative to publish a "proposed list of products and corresponding tariff increases," and allow a period of "notice and comment." *Id.* at 3-4.  On the same day, the Trade Representative released a report on the results of the Four-Year Review.  *See* Ex. 16.

F.    The Trade Representative Provides An Opportunity To Comment On The Proposed Modifications  And Retractable Files A Comment

On May 28, 2024, in accordance with the President's specific direction, the Trade Representative issued a notice of the proposed modifications of the actions and announced the opportunity for public comment..[14]  Specifically, the Trade Representative proposed tariff increases on specific products within the product categories identified in the President's memorandum, spanning 382 HTSUS subheadings and 5 statistical reporting numbers of the HTSUS, with "an approximate annual trade value of $18 billion."  Ex. 17 at 5.

---

[13]  The President also took into account the  "approximately 1,500 written submissions" that the Trade Representative considered in its review.  Ex. 15 at 1.

[14]  *Request for Comments on Proposed Modifications and Machinery Exclusion Process in Four-Year Review of Actions Taken in the Section 301 Investigation: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 89 Fed. Reg. 46,252 (U.S. Trade Representative, May 28, 2024) (Ex. 17).

Interested persons were "invited to comment" on "the effectiveness" of the proposed modification on eliminating China's unfair practices regarding technology transfer, and "the effect" of the proposal on the U.S. economy, including consumers. Ex. 17 at 5-6. The notice also sought comment on whether the tariffs on facemasks, medical gloves, syringes, and needles should be higher than the proposed rates reflecting the minimum directed by the President. *Id.* at 6.

The Trade Representative received more than 1,100 comments. Retractable submitted comments asking the Trade Representative not to raise "the tariff on goods in HTS 90183100 and 90183200 from China . . . until changes can be made to prevent the tariff's negative effect[.]" *See* Retractable Technologies, Inc. Comment at 4, USTR-2024-0007-00108478 (June 28, 2024) (Ex. 24). Retractable argued the proposed tariffs would place it at a disadvantage compared to competitors in the marketplace—such as Becton Dickinson and Cardinal Health. *Id.* Despite apparently opposing the proposed tariffs, Retractable highlighted (1) the investment in Retractable by the "U.S. Government (DOD, HHS, and ASPR [Administration for Strategic Preparedness and Response]) . . . to increase domestic manufacturing capacity for syringes and needles," and (2) the concern that Retractable's competitors would seek to "avoid the tariff on syringes and needles made in China" by listing "Hong Kong as the country of origin on their house bill of lading." *Id.* at 5, 7.

Numerous commenters raised concerns regarding the limited availability of enteral syringes outside of China and advised against imposing tariffs on enteral syringes specifically. *See* Ex. 30 (discussing comments)[15]; *see, e.g.*, Exs. 18-23, Ex. 27, Ex. 29. For example, the

---

[15] *Notice of Modification: China's Acts, Policies and Practices Related to Technology Transfer, Intellectual Property and Innovation*, 89 Fed. Reg. 76,581 (U.S. Trade Representative September 18, 2024).

Federation of American Hospitals explained that "there are no US-based manufacturing alternatives of enteral feeding syringes." Federation of American Hospitals Comment, USTR-2024-0007-00108191 (June 28, 2024) (Ex. 26). With respect to other needles and syringes and critical medical supplies more broadly, the Federation of American Hospitals stated higher tariffs on medical supplies would translate to higher costs for hospitals and other medical facilities. *Id.*

Other commenters requested increasing the tariffs on needles and syringes to 100 percent or the "maximum" amount. *See* Becton Dickinson Comment, USTR-2024-0007-00108103 (June 28, 2024) (Ex. 25), American Medical Manufacturers Association Comment, USTR-2024-0007-00107987 (June 28, 2024) (Ex. 28). For example, the American Medical Manufacturers Association requested "further action" to ensure that "U.S. healthcare workers and patients have access to safe and reliable medical products," including raising the tariff on needles and syringes (among other products) to "a minimum of 100%." Ex. 28 at 2. Becton Dickinson similarly argued that the "maximum tariff level available is needed to retain and attract quality needle and syringe manufacturing in the United States." Ex. 25 at 3.

G.    The Trade Representative Modifies The Section 301 Actions, Imposing Additional Tariffs On Syringes And Needles

On September 18, 2024, the Trade Representative issued a Federal Register notice with the final modifications increasing tariffs on 382 HTSUS subheadings and 7 statistical reporting numbers of the HTSUS.[16] Considering the comments and the advice of the section 301 committee, the Trade Representative recognized "that syringes and needles are critical to U.S. preparedness in responding to public health emergencies and the need to maintain alternative

---

[16] *Notice of Modification: China's Acts, Policies and Practices Related to Technology Transfer, Intellectual Property and Innovation*, 89 Fed. Reg. 76,581 (U.S. Trade Representative September 18, 2024) (Ex. 30).

sources." Ex. 30 at 22.  Consistent with the President's direction, the Trade Representative "determined to increase tariffs on syringes and needles under the two subheadings to 100 percent in 2024." *Id.* at 22; *see also* Ex. 30 at Annex A (increasing tariffs for HTSUS subheadings 9018.31.00 and 9018.32.00 to 100 percent by 2024).[17]

However, the Trade Representative "determined to exclude enteral syringes through January 1, 2026" to address the "possible shortage of enteral syringes." Ex. 30 at 22.  A "large number" of comments had reported "limited availability of enteral syringes outside of China and assert that the proposed increase would impact the supply of enteral syringes, which are necessary for vulnerable patients." *Id.*

### H.    Retractable Files Suit And Seeks To Preliminarily Enjoin Collection Of Section 301 Duties On Millions Of Dollars Of Imports From China

The day before the Section 301 tariffs were set to take effect, Retractable filed suit seeking a temporary restraining order and preliminary injunction preventing the United States from collecting section 301 duties on Retractable's imports from China.  Compl., ECF No. 4; Pl. Mot., ECF No. 5.  In a declaration filed in support of preliminary injunctive relief, Retractable's founder, Thomas Shaw, stated that "[t]he 100% tariff rate would force Retractable to sell some of [its] syringes and needles at a loss."  Shaw Decl. ¶ 89, ECF No. 18.  According to Retractable's chief financial officer, Retractable has an upcoming shipment of syringes and needles from China "with a cost value of approximately $522,700."  Fort Decl. ¶ 18, ECF 20.  If the shipment is subject to a 100 percent tariff, the chief financial officer testified that "Retractable may be forced to sell [the merchandise] at a loss."  *Id.* ¶ 20.

---

[17]  The notice provided that tariff increases in 2024 would apply "to products that are entered for consumption, or withdrawn from warehouse for consumption, on or after September 27, 2024."  Ex. 30.

On the merits, Retractable argues that the Trade Representative failed to adequately "consult" with Retractable, and that "voices like Retractable . . . were unheard in the lead up to President Biden's directive." Pl. Mot. at 3, 9. Retractable also contends that the imposition of the tariff was "ultra vires" and "should be set aside under the Administrative Procedure Act as arbitrary and capricious." *Id.* at 3.

SUMMARY OF THE ARGUMENT

Retractable's complaint should be dismissed. As an initial matter, the Court lacks jurisdiction to entertain Retractable's policy arguments that second-guess the President's findings and exercise of discretion in directing the U.S. Trade Representative to modify the section 301 action. Moreover, Retractable's remaining allegations fail to state a claim for relief. Retractable is simply wrong that the absence of tariffs on needles and syringes in the original section 301 action means that the challenged modification is ultra vires. Once modification is appropriate (which Retractable does not meaningfully contest), the statute authorizes all appropriate and feasible action—including tariffs on goods regardless of whether they were involved in the underlying unfair trade practices. Retractable fails to state a claim that the Trade Representative erred in finding the challenged tariffs were appropriate or did not to satisfy required procedures.

In any event, Retractable fails to demonstrate entitlement to preliminary injunctive relief. Not only is Retractable unlikely to succeed on the merits, but it also falls short on the remaining equitable factors required for preliminary injunctive relief. To preliminarily enjoin collection of the section 301 tariffs, Retractable must show immediate and irreparable harm from paying the tariffs. Retractable has not met this standard. The prospect that Retractable will have to sell merchandise at a loss—as stated by its declarants—is not enough. Nothing in the section 301

15

statutory scheme excuses payment of duties based on financial hardship alone.  Authorizing

extraordinary injunctive relief on this basis would undercut the very purpose of the section 301

actions—to obtain the elimination of China's unfair trade practices that burden the U.S.

economy.

Retractable's arguments on the remaining injunctive factors are unpersuasive because

they ask the Court to re-weigh the policy choices implicated by the section 301 actions.  The

"appropriate" policy choices in this arena are for the President and Trade Representative to

decide.  *See* 19 U.S.C. § 2411(b).  Because Retractable's requested relief would undermine the

Trade Representative's appropriate response to China's unfair trade practices, the relief

requested by Retractable is not supported by equity or the law—and should be rejected.

<u>ARGUMENT</u>

I.    <u>Retractable's Complaint Should Be Dismissed Pursuant To Rules 12(b)(6) And 12(b)(6)</u>

The Court should dismiss Retractable's complaint pursuant to Rules 12(b)(1) and

12(b)(6).  The Court does not possess jurisdiction to review to the President's exercise of

discretion directing the Trade Representative to modify the section 301 actions by (among other

things) imposing tariffs of 50 percent or greater on needles and syringes.  Further, Retractable

fails to state a claim that the Trade Representative failed to rationally implement the President's

direction or otherwise comply with applicable procedures.

A.    <u>Standards Governing Motions To Dismiss Pursuant To Rule 12(b)(1) and 12(b)(6)</u>

A plaintiff bears the burden of establishing subject matter jurisdiction.  *Norsk Hydro

Can., Inc. v. United States*, 472 F.3d 1347, 1355 (Fed. Cir. 2006).  In deciding a motion to

dismiss for lack of jurisdiction filed pursuant to Rule 12(b)(1) of this Court's rules, the Court

generally accepts as true all uncontroverted factual allegations in the complaint.  *Engage*

*Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011).  However, "[i]f the Rule

12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction," "the allegations

in the complaint are not controlling." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583

(Fed. Cir. 1993).

A complaint that "fail{s} to state a claim upon which relief can be granted" shall be

dismissed.  *See* R. Ct. Int'l Trade 12(b)(6); *see also* R. Ct. Int'l Trade 8.  To survive a motion to

dismiss for failure to state a claim filed under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id*.  When reviewing a motion to dismiss for failure to state a claim, the Court considers the well-

pleaded allegations in the complaint and matters incorporated by reference.  *See, e.g.*, *Bell/Heery*

*v. United States*, 106 Fed. Cl. 300, 307 (2012) (considering "matters incorporated by reference or

integral to the claim, items subject to judicial notice, [and] matters of public record."), *aff'd* 739

F.3d 1324 (2014).

> B.    This Court Does Not Possess Jurisdiction To Review The President's Exercise Of
>        Discretion To Direct The Trade Representative To Add Tariffs Of At Least 50
>        Percent On Syringes And Needles

As an initial matter, the Court lacks jurisdiction to entertain Retractable's policy

arguments that challenge the President's exercise of discretion in directing tariffs on needles and

syringes.  For example, Retractable argues that the imposition of tariffs on needles and syringes

is "arbitrary and capricious" and harmful to the healthcare industry.  *See* R. Ct. Int'l Trade

12(b)(1); Compl. ¶¶ 190, 193.  According to Retractable, the President directed action that would

17

"actually harm domestic supply chain resiliency." Compl. at ¶ 167. These arguments challenge the President's findings of fact and exercise of discretion, which are beyond this Court's jurisdiction to review.

The basis for jurisdiction in this case is 19 U.S.C. § 1581(i), which establishes "exclusive jurisdiction of any civil action commenced *against the United States, its agencies, or its officers*" arising from laws providing for (among other things) "tariffs" and "duties." 28 U.S.C. § 1581(i)(1)(B) (emphasis added). Section 1581(i) "does not authorize proceedings directly against the President." *Corus Grp. PLC. v. Int'l Trade Commn*, 352 F.3d 1351, 1359 (Fed. Cir. 2003).

Challenges pursuant to section 1581(i) are reviewed under the deferential standard of review set forth in the Administrative Procedure Act, 28 U.S.C. § 2640(e) (5 U.S.C. § 706), which does not allow for review of Presidential action. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). It is well established that the President is not an "agency" within the meaning of the APA, and, therefore, "the President's actions . . . are not reviewable" under that statute. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *see also Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1340 (Fed. Cir. 2010). Thus, the President's "findings of fact and the motivations for his action are not subject to review." *Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885, 894 (Fed. Cir. 2023). How the President "'chooses to exercise the discretion Congress has granted him is not a matter for {the Court's} review.'" *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1369 (Fed. Cir. 2022) (citing *Dalton*, 511 U.S. at 476).

In this case, the President's direction to the Trade Representative to impose tariffs on needles and syringes was a discretionary decision specifically authorized by statute. "The Trade

18

Representative may modify or terminate any action, *subject to the specific direction*, if any, of the President[.]"  19 U.S.C. § 2417(a)(1) (emphasis added).  Modification is permitted when (among other conditions) (1) there is an increase in "the burden or restriction on United States commerce" of the underlying unfair trade practices investigated under section 301 or (2) the discretionary section 301 action "is no longer appropriate."  19 U.S.C. § 2417(a)(1)(B), (C).  Once modification is permitted, the President has discretion to direct any action that would be "appropriate" pursuant to section 301, including imposition of duties.  *See* 19 U.S.C. § 2411(b), 2417(a).

There can be no meaningful dispute that the statutory predicates for modification are present in this case based on the President's findings of fact.  Specifically, the President found that China's continued and aggressive attempts "to acquire and absorb foreign technology and intellectual property"—including "through cyber intrusions and cybertheft"—added "to the burden or restriction on United States commerce."  Ex. 15 at 2.  Nothing more is required to justify the modification.  *See* 19 U.S.C. § 2417(a)(1)(B); *see also In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1331 (Ct. Int'l Trade 2022), *appeal filed* Fed. Cir. No. 23-1891.  This finding of fact by the President is "not subject to review."  *Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885, 894 (Fed. Cir. 2023).

Having established the predicate for a modification, the President had discretion to direct the Trade Representative to take all "appropriate and feasible" action to obtain the elimination of China's unfair trade practices related to technology transfer, including the imposition of duties.  19 U.S.C. § 2411(b), (c).  Such duties may be imposed on goods from the investigated foreign country, regardless of whether the goods were involved in the underlying unfair practices.  19 U.S.C. § 2411(c)(3).  The barometer for assessing the timing and amount of such duties is

whether they are "appropriate" to obtain the elimination of the unfair trade practice—an exercise of predictive judgment delegated to the Trade Representative, subject to the direction of the President. 19 U.S.C. § 2411(b).

The President found that "additional section 301 tariffs would provide incentives for China to eliminate the acts, policies, and practices at issue." Ex. 15 at 2. By choosing to apply tariffs to "facemasks, medical gloves, and syringes and needles"—among a long list of other products—the President exercised his discretion regarding what action would be "appropriate and feasible." Presidential actions under such open-ended authority are "sufficiently discretionary to preclude judicial review." *Motions Sys. Corp.*, 437 F.3d at 1361-62 (finding such sufficient discretion despite statutory requirement that the President determine "that provision of [import] relief is not in the national economic interest of the United States or . . . that the taking of action . . . would cause serious harm to the national security of the United States"). The President's discretionary decision is not subject to review. *Dalton*, 511 U.S. at 476.

The Court also lacks jurisdiction to entertain Retractable's challenges to the Trade Representative's recommendation to the President. *See, e.g.*, Compl. ¶ 117. "The Supreme Court has established that where the President has complete discretion whether to take an action in the first place, *courts are without authority* to review the validity of an agency recommendation to the President regarding such action." *Corus Grp. PLC. v. Int'l Trade Comm'n*, 352 F.3d 1351, 1358 (Fed. Cir. 2003) (citing *Dalton v. Specter*, 511 U.S. 462, 469–70 (1994); *Franklin v. Massachusetts*, 505 U.S. 788, 797–99 (1992)) (emphasis added). That is precisely the case here, in which the President has discretion to direct all appropriate and feasible action when modifying a section 301 action. *See* 19 U.S.C. §§ 2417(a), 2411(b). Thus, the Court lacks authority to review how the President's exercised his discretion. Further, because

the President had discretion to direct the modification, the Court likewise lacks authority "to review the validity of" the Trade Representative's "recommendation to the President regarding such action."  *Corus Grp.*, 352 F.3d at 1358; *see also* Ex. 16.

C.    Retractable Fails To State A Claim That The Trade Representative Failed To Rationally Implement The President's Direction Or Comply With Statutory Procedures

The remainder of Retractable's complaint should be dismissed for failure to state a claim. In a section 1581(i) action, the Court applies the standard of review set forth in the Administrative Procedures Act.  *Shakeproof Indus. Prods. Div. of Ill. Tool Works, Inc. v. United States*, 104 F. 3d 1309, 1313 (Fed. Cir. 1997).  The Court may "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Retractable argues that the Trade Representative's imposition of duties on needles and syringes was irrational and violated the statute's requirement for consultation with representatives of the domestic industry.  Compl. ¶¶ 179, 187.  Because Retractable fails to state a claim that any of the Trade Representative's actions were arbitrary, capricious, or contrary to law, the complaint should be dismissed.[18]

1.    Retractable Has Not Stated A Claim That The Trade Representative Failed To Consult With The Domestic Industry Concerned Pursuant To 19 U.S.C. § 2417(a)(2)

First, Retractable fails to state a claim that the Trade Representative did not engage in consultation with representatives of the domestic industry concerned with the section 301 action.  *See* Compl ¶¶ 165, 179.  Before taking action to modify an existing section 301 action, "the

---

[18]  This case does not present an agency decision "reviewed on the record of an agency hearing provided by statute," and thus does not involve substantial evidence review.  5 U.S.C. § 706.

Trade Representative shall consult with the petitioner, if any, and with representatives of the domestic industry concerned[.]" 19 U.S.C. § 2417(a).  The Trade Representative shall also "provide opportunity for the presentation of views by other interested persons affected by the proposed modification or termination concerning the effects of the modification or termination and whether any modification or termination of the action is appropriate."[19]  19 U.S.C. § 2417(a).

Retractable contends that the Trade Representative failed to consult with it, as a "member" of the domestic industry.  *See* Compl. ¶¶ 95-97.  Even taking all allegations in the complaint as true, this argument is wrong because it misinterprets all of the relevant terms in the statute —"representatives," "domestic industry," and "consult."

First, Retractable misunderstands the meaning of "representatives" of the domestic industry concerned.  *See* 19 U.S.C. § 2417(a)(2).  By claiming that the Trade Representative should have reached out to Retractable individually, Retractable interprets the statute to require consultation with *all* members of the domestic industry.  *See, e.g.*, Compl. ¶ 179 (arguing failure to consult with "any representative of Retractable").  That is not what the statute says.  Instead, the statute requires consultation with the petitioner, if any, and with "representatives" of the domestic industry concerned.  19 U.S.C. § 2417(a)(2).  This provision parallels the "[c]onsultation upon initiation of investigation," requiring the Trade Representative to (among other things) "seek information and advice from the petitioner (if any) and the appropriate

---

[19] As the Federal Circuit previously observed in *dicta*, these provisions "expressly provide that some of the USTR's actions *are contingent* upon an actual consultation with the domestic industry (which entails, at the very least, notice)[.]"  *Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1365 (Fed. Cir. 2010) (quoting *Gilda II*, 625 F. Supp. 2d at 1383 (citing 19 U.S.C. §§ 2417(a)(2), 2416(b)).

committees established pursuant to section 2155 of this title," 19 U.S.C. § 2413(a)(3), which include "*representative* elements of the private sector," 19 U.S.C. § 2155(a) (emphasis added).

Retractable's claim also conflicts with the plain meaning of "representative." "Representative" means "[s]omeone who stands for or acts on behalf of another,"[20] or someone "serving as a typical or characteristic example of a particular group of people or of a particular thing."[21]  Because Retractable's complaint contains no well-pleaded allegation that the Trade Representative failed to consult with any "representatives" of the domestic industry concerned, the complaint must be dismissed for failure to state a claim.[22]

Second, Retractable has not stated a claim that it qualifies as part of "the domestic industry concerned" with the section 301 action.  *See* 19 U.S.C. § 2417(a)(2).  The statute distinguishes between "representatives of the domestic industry concerned" that are entitled to consultation and "interested parties" that may present their views regarding the proposed modification.  *See* 19 U.S.C. § 2417(a)(2).  For purposes of this section, the term "interested persons" includes "domestic firms . . . and any industrial user of any goods or services that may be affected by actions taken" under section 2411(a) or (b).  19 U.S.C. § 2411(d)(9).

Based on its allegations in the complaint, Compl. ¶ 18, Retractable fits within the definition of an interested party.  19 U.S.C. § 2411(d)(9).  Retractable alleges that it has "outsource[d] its production to China," Compl. ¶¶ 7, 54, and told the Trade Representative that it does "not have the equipment" to produce the relevant merchandise in the United States, Ex. 24

---

[20]  Representative, Black's Law Dictionary (12th ed. 2024).

[21]  Representative, *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/representative (last accessed on Oct. 9, 2024).

[22]   Regardless, as discussed below, the Trade Representative did consult with representatives of the domestic industry.

at 4.  Retractable's argument that it is nonetheless "the domestic industry" would expand the

meaning of that term to include domestic importers of foreign merchandise.  *See* Compl. ¶ 179.

Such an expansion would be contrary to the use of the term "domestic industry" in the "overall

structure of the Trade Act" of 1974.  *See Solar Energy Indus. Ass'n v. United States*, 111 F.4th

1349, 1355 (Fed. Cir. 2024) (considering the "overall structure of the Trade Act" of 1974 when

interpreting a particular provision).[23]

Finally, even assuming Retractable could show that the Trade Representative was

required to consult with it specifically, Retractable's allegations fail to state a claim that the

Trade Representative did not "consult" with Retractable.  "The ordinary meaning of the term

'consult' is to seek an opinion or advice, or to deliberate."  *HIAS, Inc. v. Trump*, 985 F.3d 309,

320–21 (4th Cir. 2021) (citing *Consult*, Webster's Third New International Dictionary,

Unabridged (2020)).  The Trade Representative sought such opinion and advice on at least two

separate occasions—in October 2022 and May 2024.  On October 17, 2022, for example, the

Trade Representative invited opinions regarding potential section 301 "actions against other

products or services," Ex. 13 at 3, and the impact of "other possible actions on U.S. supply chain

resilience or the goals of U.S. critical supply chains[.]"  Ex. 13 at 12 (questionnaire at p. 7, citing

Executive Order 14017 and "subsequent reports and findings").

---

[23]  "It is a fundamental canon of statutory construction that the words of a statute must be
read in their context and with a view to their place in the overall statutory scheme."  *Food &
Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal
quotation marks omitted).  Although section 301 does not specifically define domestic industry,
it consistently references "the" domestic industry (using a definite article) in parallel with "the
petitioner, if any" that filed the petition leading to the section 301 investigation.  *See, e.g.*, 19
U.S.C. §§ 2417(a)(2), 2416(d); *see also id.* § 2412 (discussing initiation of investigation by the
filing of a petition).  Similarly, the statute repeatedly references the domestic industry that
"benefits" from the section 301 action.  *See* 19 U.S.C. § 2417(c)(1)(B).

Given the thousands of products already covered by the existing section 301 actions, it was foreseeable that *any* product from China—including products not currently subject to the action—could be considered as part of potential "other actions" under section 301.  Despite this opportunity to provide advice and opinions, Retractable concedes that it "did not submit comments to this October 17, 2022 notice."  Compl. at ¶ 97.

Additional consultation occurred after the President's direction.  *See* Compl. ¶¶ 131-132 (referencing the opportunity for comment on the proposed modification); Ex. 17.  On May 28, 2024, the Trade Representative issued a notice of the proposed modification of the Section 301 actions.  Ex. 17.  The notice invited opinions regarding "the effectiveness" of the proposed modification on eliminating China's unfair practices regarding technology transfer, and "the effect" of the proposal on the U.S. economy, including consumers.  Ex. 17 at 6.  It also sought comment on additional topics, including whether the tariffs on facemasks, medical gloves, syringes and needles should be higher than the proposed rates reflecting the minimum directed by the President.  Ex. 17 at 6.  In response, Retractable shared its opinion that the Trade Representative should not raise "the tariff on goods in HTS 90183100 and 90183200 from China . . . until changes can be made to prevent the tariff's negative effect[.]"  *See* Ex. 24 at 4.

To the extent that Retractable argues that more or different consultation was required, it is incorrect.  Congress knew how to specify particular methods of communication with the domestic industry when it chose to do so.  For example, before terminating a section 301 action, the Trade Representative must "*notify by mail* the petitioner and representatives of the domestic industry" that benefit from the section 301 action at least 60 days before terminating the action.  19 U.S.C. § 2417(c)(2) (emphasis added).  By contrast, section 2417(a)(2) does not specify how consultation should occur—leaving the Trade Representative free to choose the most appropriate

method.  *Cf. Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543

(1978) (quoting *FCC v. Schreiber*, 381 U.S. 279, 290 (1965)) (cleaned up) (explaining that

agencies are "free to fashion their own rules of procedure and to pursue methods of inquiry

capable of permitting them to discharge their multitudinous duties").  Thus, the Trade

Representative was free to consult with the domestic industry by seeking opinion and advice in

writing, as it did in this case.  *See, e.g.¸* Ex. 17 at 5-6.

> 2.    Retractable Has Not Stated A Claim That The Trade Representative's
>        Implementation Of The President's Directive Was Arbitrary And
>        Capricious

Finally, Retractable's challenge to the rationality of the duties on needles and syringes

fails to state a claim for relief.  Compl. ¶¶ at 165-167.  At bottom, Retractable challenges the

inclusion of tariffs on its products when needles and syringes were not previously subject to

section 301 tariffs.  *See* Compl. at ¶ 182.  However, even taking all allegations as true and

drawing all factual inferences in Retractable's favor, Retractable has failed to show that it was

arbitrary or capricious for the Trade Representative to find it "appropriate and feasible" to

increase tariffs on tariff subheadings 9018.31.00 and 9018.32.00.

Indeed, once modification is appropriate, the statute authorizes imposition of tariffs on

goods regardless of whether they were involved in the underlying unfair trade practice.  19

U.S.C. § 2411(c)(3).  In this case, the Trade Representative explained that modification was

appropriate because (1) many of China's technology transfer-related practices "persist and

increasingly burden or restrict U.S. commerce," 19 U.S.C. § 2417(a)(1)(B), and (2) maintaining

the current action was no longer "appropriate" to induce China to eliminate its unfair practices,

19 U.S.C. § 2714(a)(1)(C).  Ex. 30 at 7.  Retractable fails to challenge either of these key determinations.[24]

The question thus boils down to whether the challenged action was "appropriate"—a discretion-heavy determination that is delegated to the Trade Representative, subject to any direction by the President.  *See* 19 U.S.C. § 2411(b).  As the Trade Representative explained, the modification imposed tariffs on "categories of products targeted by China for dominance and/or *sectors where the U.S. recently made significant domestic investments*."  Ex. 30 at 9 (emphasis added).  By targeting these areas, the Trade Representative made the "predictive judgment" that focusing on these areas would provide leverage and "incentiviz[e] China to eliminate the investigated acts, policies, and practices, and mitigate[e] possible harm to the U.S. economy."  Ex. 30 at 7, 9.  Retractable's complaint confirms needles and syringes fall into this category, alleging that during the COVID-19 pandemic, "Retractable and the U.S. government *committed approximately $138 million* to establish additional production lines in Little Elm, Texas, to one day enhance domestic manufacturing capacity."  Compl. ¶ 81 (emphasis added).[25]

Finally, any challenge to the Trade Representative's imposition of 100 percent tariffs—instead of 50 percent—is not actionable.  The Trade Representative rationally imposed a tariff of

---

[24]  For this reason, the fact that the Trade Representative previously considered imposing duties on needles and syringes (but did not do so in the original section 301 action) is irrelevant.  *See* Pl. Mot. at 12 (arguing that "USTR considered and rejected such tariffs in 2018").  Again, once the modification is authorized, the statute authorizes "all appropriate and feasible action" permitted under section 301—including the imposition of duties on goods, regardless of whether involved in the underlying unfair trade practices.  *See* 19 U.S.C. § 2411(b), (c)(3).

[25]  Retractable's allegations also support the Trade Representative reasoning that "syringes and needles are critical to U.S. preparedness in responding to public health emergencies."  Ex. 30 at 22.  For example, Retractable alleges that its syringes were important during the COVID-19 response, and "allowed healthcare workers to withdraw additional doses from COVID-19 vaccine vials, accelerating the vaccination rollout by twenty percent."  Compl. ¶ 76.

100 percent when "several comments suggest that higher rates would help support domestic manufacturing and recommended rates as high as 100 percent." Ex. 30 at 22. To the extent Retractable disputes the exclusion of enteral syringes, *see* Compl. ¶ 167, the Trade Representative rationally explained that "a large number of comments report a limited availability of enteral syringes outside of China and assert that the proposed increase would impact the supply of enteral syringes, which are necessary for vulnerable patients." Ex. 30 at 22. The Trade Representative's resulting determination "to exclude enteral syringes through January 1, 2026" simply confirms the meaningful nature of the comment period—and does not undermine the rational basis for applying tariffs to needles and syringes in general.

For these reasons, we respectfully request that the Court dismiss Retractable's complaint for failure to state a claim on which relief can be granted.

## II.    Retractable's Request For A Preliminary Injunction Should Be Denied

In any event, there is no basis for granting Retractable's request for preliminary injunctive relief. Retractable seeks the Court's imprimatur to import millions of dollars in merchandise into the United States without paying the applicable section 301 duties. Despite thousands of cases being filed to challenge section 301 duties to date, *see, e.g.*, *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1358 (Ct. Int'l Trade 2021) (citing "approximately 3,6000 cases"), we are not aware of similar relief being granted in any of these cases. Contrary to Retractable's arguments, there is nothing special about this case to merit such extraordinary relief. Retractable fails to establish irreparable harm or likelihood of success on the merits, and the remaining

equitable factors—balancing of the harms and the public interest—favor denying the requested relief.

A.    <u>Standard of Review For Granting Injunctive Relief</u>

"{A} preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).  A preliminary injunction is "never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

"To receive a preliminary injunction, the movant must show '(1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest.'"  *Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1345 (Fed. Cir. 2019) (quoting *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018)).  "Central to the movant's burden are the likelihood of success and irreparable harm factors."  *Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1219 (Fed. Cir. 1996).  "{C}ase law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, i.e., likelihood of success on the merits and irreparable harm."  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

Although the Court has broad discretion to grant or withhold injunctions, preliminary injunctive relief must be granted "sparingly" due to its extraordinary nature.  *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983); *Manhattan Shirt Co. v. United States*, 2 CIT 270, 272 (1981).  Preliminary injunctive relief should only be granted upon a clear showing by the moving party that it is entitled to the relief requested.  *Am. Inst. for Imported Steel, Inc. v.*

*United States*, 8 CIT 317 (1984).  Further, the Court must be cautious to avoid "undue judicial interference with the lawful discretion given to agencies." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1384 (Fed. Cir. 2009) (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004)).

      B.      <u>Plaintiff Has Failed To Demonstrate Immediate, Irreparable Harm</u>

To obtain injunctive relief, plaintiff must establish  that it "will be immediately and irreparably injured" before the Court can decide the case on the merits. *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT 584, 588 (1989).  "A preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great.  A presently existing, actual threat must be shown." *S.J. Stile Assocs. Ltd. v. Snyder*, 646 F.2d 522, 525 (C.C.P.A. 1981)).  Irreparable harm means "serious harm that cannot be undone." *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (citing S.J. Stile, 646 F.2d at 525).

Retractable fails to identify any immediate and irreparable harm that satisfies this standard.  Instead, the declarations and evidence it submitted reflect nothing more than the possibility of garden-variety economic loss.  *See* Shaw Decl., ECF 18; Lervisit Decl., ECF 19, Fort Decl., ECF 20.  Nor will Retractable suffer irreparable harm from liquidation of its entries because the United States is prepared to enter a stipulation regarding reliquidation, as it has done in another recent case.  *See* Joint Proposed Stipulation, *Auxin Solar, Inc. v. United States*, Ct. Int'l Trade No. 23-274, ECF No. 19 (providing a stipulation regarding ordering reliquidation).  Thus, even if Retractable could ultimately succeed on the merits of the case, any economic loss it experiences in the interim may be remedied upon final judgment.

1.    <u>Retractable Faces No Irreparable Harm From Liquidation</u>

As an initial matter, Retractable fails to demonstrate irreparable harm resulting from liquidation of its entries.  This Court has previously held that "[l]iquidation, as the final computation of duties, will constitute irreparable harm unless an importer can obtain refunds or reliquidation[.]"  *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1362 (Ct. Int'l Trade 2021) (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed. Cir. 1983)).  In this case, however, Retractable has not demonstrated that it will be unable to obtain reliquidation should it prevail on the merits.

As we have done in another recent case, defendants are prepared to enter into a stipulation to not oppose the Court's authority to order reliquidation of entries that remain unliquidated as of the date when the Court rules on the proposed stipulation, as set forth below:

> Defendants stipulate that, if the Court does not dismiss this case for lack of jurisdiction, they do not and will not oppose plaintiff's argument about the Court's authority to order reliquidation of entries that remain unliquidated as of the date when the Court rules on this stipulation, even though defendants disagree with plaintiffs regarding the merits and appropriateness of granting injunctive relief. Defendants reserve the right to make arguments regarding whether the Court should order reliquidation as a remedy in the event that plaintiffs prevail on the merits.

*See* Joint Proposed Stipulation, *Auxin Solar, Inc. v. United States*, Ct. Int'l Trade No. 23-274, ECF No. 19 (providing the same stipulation).  Thus, Retractable cannot demonstrate that liquidation will foreclose it from seeking relief on the merits.  Under similar circumstances, courts have held that plaintiffs do not suffer irreparable harm.  *See Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1348 (Fed. Cir. 2019) (affirming the denial of a preliminary injunction).

2.    Retractable Faces Nothing More Than Potential Economic Loss If
      Required To Pay Applicable Section 301 Duties

Retractable has failed to present any hard evidence that it will experience immediate,

irreparable harm absent the requested injunctive relief.  Instead, Retractable has shown only the

possibility of future economic loss—which is insufficient to demonstrate irreparable harm.

Retractable is not the first plaintiff seeking to import merchandise without paying

applicable duties or cash deposits required by the statutory scheme.  This Court has declined to

create a bright-line rule for establishing irreparable harm in such cases, but has made clear "that

the threshold is high and will be very difficult to cross."  *Shree Rama Enterprises v. United*

*States*, 983 F. Supp. 192, 195 (Ct. Int'l Trade 1997).  For example, this Court found no

irreparable harm when a plaintiff claimed "significant and permanent monetary injury as a

consequence of posting large cash deposits" arising from a countervailing duty proceeding.  *Id.*

at 192 (quoting *Chilean Nitrate Corp. v. United States*, 11 C.I.T. 538, 540 (1987)).  Plaintiffs

submitted affidavits "describing the anticipated effect of increased deposit rates"—including that

the new rates would "affect between 59 and 81 percent of plaintiffs' sales revenues."  *Id.*  The

affidavits included customer letters and descriptions of conversations stating that they had or

would switch suppliers rather than pay the higher deposit rates—which, according to plaintiffs,

could "eliminate[]" certain exporters from the U.S. market.  *Id.*

The Court found this showing was "insufficient."  *Id.*  Unlike one case in which plaintiffs

established "immediate extinction," *id.* (citing *Queen's Flowers de Colombia v. United States*,

947 F. Supp. 503, 507 (Ct. Int'l Trade 1996)), the Court held that the *Shree Rama* plaintiffs did

not meet the standard for showing irreparable harm.  *Id.*  The Court explained that even

allegations of bankruptcy would be "weak evidence" if based on affidavits from interested

parties—absent "evidence from independent sources" or "hard evidence" of the serious

permanent harm that would result.  *Id.* (citing *Chilean Nitrate*, 11 CIT at 541).

In this case, similarly, Retractable fails to provide "hard evidence" of immediate

extinction absent preliminary injunctive relief.  Instead, the declarations reflect the concern that

the section 301 tariffs will cause Retractable to be less "competitive"—a concern that does not

amount to irreparable harm.  For example, Retractable's founder argues that the company

"cannot afford to pay 100% tariffs in 2024 and be competitive."  Shaw Decl. ¶ 93.  Similarly,

Mr. Shaw states that "approximately 522,700 of Retractable's syringes and needles are on the

water from China," and that "[t]he 100% tariff rate would force Retractable to sell some of these

syringes and needles at a loss."  *Id.* ¶¶ 88-89.  Such short-term losses, however, do not amount to

irreparable harm and certainly do not amount to "hard evidence" of imminent bankruptcy.  *See*

*Shree Rama*, 983 F. Supp. at 195.

Mr. Shaw also claims that Retractable "may" be forced to "cut overhead (i.e. fire

employees)," and that this "chain of events will almost certainly trigger a death spiral for the

company."  Compl. ¶¶ 95-96.  These are precisely the sort of speculative statements from

interested parties that the Court has found insufficient to establish imminent irreparable harm.

*Shree Rama*, 983 F. Supp. at 195.  Mr. Shaw does not explain the business options he has

considered to avoid the predicted insolvency.  Nor does he explain how a company that is

purportedly facing a "death spiral" has obtained millions of dollars from the Federal Government

to invest in domestic manufacturing.  *See* Compl. ¶¶ 41, 156.

The declaration from Retractable's chief financial officer likewise fails to satisfy the

relevant standard.  *See* Fort Decl. ¶¶ 12-26.  Mr. Fort argues that "[w]ithout tariff relief,

Retractable will struggle to serve its healthcare provider customers effectively."  *Id.* ¶ 23.  Mr.

Fort adds that "Retractable's stock price has dropped from $1.12 on May 14, 2024, to a five-year low of $0.71 on September 20, 2024[.]" *Id.* ¶ 29.  Nevertheless, Mr. Fort projects that in 2025, Retractable will be able "to develop a domestic manufacturing operation[.]" *Id.* at ¶ 32.  By highlighting the Federal Government's investment in domestic manufacturing and the positive prospects for that investment, Mr. Fort simply confirms that Retractable does not face imminent insolvency absent preliminary injunctive relief.

Although Retractable claims that it will experience "loss of goodwill, damage to reputation, and loss of business opportunities" absent relief, *see* Pl. Mot. at 24 (citing *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012), it fails to explain how it would incur any of these harms absent its own business decisions made as a result of lost earnings—which are not irreparable harm.  As recognized by Retractable (Pl. Mot. at 24), the longstanding rule is that "temporary loss of income" does not generally constitute irreparable harm.  *See Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

Having failed to demonstrate imminent insolvency, Retractable's reliance on the possibility of its competitor gaining market share does not move the needle.   Pl. Mot. at 24.  Retractable claims that without an injunction, it could lose contracts resulting "in a *de facto*" monopoly by its competitor, Becton Dickinson, with long-term consequences for Retractable's market share in the needle and syringe market.  Pl. Mot. at 24.  Retractable fails to support this theory—which, in any event, is inconsistent with the sound rejection of Retractable's antitrust claims in a prior case.  *See Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 889 (5th Cir. 2016).  At the time, the court found that Retractable "outsold [Becton Dickinson] in the retractable syringe sub-market."  *Id.*  Even in the relevant market for *all* safety syringes, the court found that in 2010, Becton Dickinson "had a market share of 49%, Covidien a 30% share,

Smiths a 10% share, and {Retractable} a 6% share." *Id.* Although time has passed since then, Retractable provides no hard data to support its dire predictions regarding contract or market share.

Moreover, although Retractable suggests that Becton Dickinson is its only competitor, its comments to the Trade Representative focused equally on *another* competitor—Cardinal Health. *See* Ex. 24. According to Retractable, Cardinal Health's suppliers were already in the process of building a plant in Cambodia. *Id.* Retractable advised the Trade Representative that even if it "could make all [its] products in the United States, the tariff would put [it] at disadvantage to large healthcare distributors" whose Chinese manufacturers were already in the process of building a plant in Cambodia. *Id.* Regardless of the accuracy of these claims, Retractable's concerns about competitiveness with other suppliers does not establish irreparable harm. *See Shree Rama*, 983 F. Supp. 195 (no irreparable harm even when plaintiffs submitted evidence customers planned to use new suppliers).

Granting a preliminary injunction on "so little documentary evidence" in this case would amount to a holding that "any substantial increase" in tariffs "before a final court decision constitutes irreparable harm *per se.*" *Cf. Shree Rama Enterprises v. United States*, 983 F. Supp. 192, 195 (Ct. Int'l Trade 1997) (discussing cash deposits in a countervailing duty case). Such a "categorical" approach is impermissible when deciding whether a particular case presents "exceptional circumstances" justifying injunctive relief. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 394 (2006). Retractable's failure to establish irreparable harm is sufficient to deny the preliminary injunction.[26]

---

[26] *See Shree Rama¸* 983 F. Supp. at 195-196 (finding it unnecessary to "discuss the remaining" injunctive factors in depth when "plaintiffs have failed to establish irreparable harm"); *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) (holding that the "absence

C.    Retractable Fails To Establish Likelihood Of Success On The Merits

Retractable is also unable to establish likelihood of success on the merits.  Instead,

Retractable's complaint alleges claims that are outside of the Court's jurisdiction or fail to state a

claim on which relief may be granted.  *See* Section I; *see also* Compl., ECF No. 4.  Even if the

Court does not dismiss the case, Retractable's motion for preliminary injunction fails to establish

likelihood of success on the merits based on the full administrative record.

In a section 1581(i) action, the Court applies the standard of review set forth in the

Administrative Procedures Act.  *Shakeproof Indus. Prods. Div. of Ill. Tool Works, Inc. v. United*

*States*, 104 F. 3d 1309, 1313 (Fed. Cir. 1997).  The Court may "hold unlawful and set aside

agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Retractable has not

demonstrated likelihood of success under this deferential standard.

Retractable raises three primary arguments, each of which is unpersuasive.

1.    Retractable Misunderstands The Nature Of The Section 301 Inquiry

First, Retractable claims that the tariff on syringes and needles is "ultra vires" because

there was no underlying section 301 tariff covering those specific products, and thus no section

301 action that could be modified.  Pl. Mot. at 12-14.  Again, Retractable misunderstands the

nature of the section 301 inquiry, which was targeted at China's unfair practices regarding

technology transfer—not any particular product.  Having found that China engaged in unfair

practices that burden or restricted United States commerce, *see* 19 U.S.C. § 2411(b), the Trade

Representative was authorized to take "all other appropriate and feasible action authorized under

_____

of an adequate showing with regard to any one factor may be sufficient, given the weight or lack
of it assigned the other factors, to justify the denial [of an injunction]").

subsection (c)"—including imposition of "duties or other import restrictions" on goods from China "for such time as the Trade Representative determines appropriate." 19 U.S.C. § 2411(b), (c)(2). As the Trade Representative explained, section 2411(c)(3)(B) "authorizes the U.S. Trade Representative to take action against any goods or economic sector of the foreign country concerned regardless of whether or not such goods or economic sector are involved in the act, policy, or practice subject to investigation." Ex. 30 at 7-8.

Over the course of the section 301 action, the Trade Representative imposed tariffs on approximately 11,000 tariff subheadings—the vast majority of total subheadings in the HTSUS. Retractable is wrong in claiming that an entirely new section 301 investigation was required to impose tariffs on needles and syringes—which represent only two tariff subheadings among the thousands of others comprising the "appropriate and feasible" action to obtain the elimination of China's unfair practices. *See* 19 U.S.C. § 2411(b).

2.    The Trade Representative Consulted With Domestic Industry

Second, as discussed above, Retractable is also wrong in claiming that the Trade Representative failed to consult with the domestic industry. Pl. Mot. at 19; *see also* Section I(B); 19 U.S.C. § 2417(a)(2). The Trade Representative consulted with representatives of the domestic industry—and others—by (1) undertaking consultations with the private sector advisory committees established under 19 U.S.C. § 2155, (2) requesting advice and opinions in October 2022 regarding potential section 301 "actions against other products or services," Ex. 13 at 3, and (3) requesting additional comment in May 2024 regarding the effectiveness and impacts of the proposed modifications, Ex. 17 at 5-6. Retractable actually submitted feedback in June 2024 regarding the proposed modifications—"[b]efore" the Trade Representative took action "to modify" the section 301 action. *See* 19 U.S.C. § 2417(b); *see* Ex. 24. As discussed above,

Retractable's arguments to the contrary fail to give effect to any of the key terms, including "representatives," "domestic industry," or "consult."  *See* Section I(B).

Retractable concedes that it submitted a written comment, but claims that there was no meaningful opportunity for feedback because the President already directed the Trade Representative to impose tariffs on needles and syringes.  Pl. Mot. at 19-20.  However, the Trade Representative sought wide-ranging feedback regarding "the effectiveness" of the proposed modification on eliminating China's unfair practices regarding technology transfer, and "the effect" of the proposal on the U.S. economy, including consumers.  Ex. 17 at 5-6.  Although the President had already directed the Trade Representative to impose at least a 50 percent tariff on needles and syringes, he also directed the Trade Representative to publish a "proposed list of products and corresponding tariff increases," and allowed a period of "notice and comment." Ex. 15 at 3-4.  The Trade Representative retained discretion to select tariff subheadings and address feedback provided during notice and comment.  The example of enteral syringes—which the Trade Representative ultimately determined to exclude from the tariff action until 2026, after receiving widespread comment on the issue—demonstrates that the Trade Representative remained responsive to public comment during the consultation process.[27]

> 3.   The APA Does Not Apply And, Even If It Did, The Trade Representative Responded To Significant Comments

Third, Retractable contends that the Trade Representative violated the Administrative Procedure Act by failing to provide "reasoned decisionmaking."  Pl.. Mot. at 23 (citing, *e.g.*,

---

[27]  Retractable argues that "USTR's grant of a tariff exemption for enteral syringes extending to 2026 is further evidence that such delay is of little consequence to the United States."  Pl. Mot. at 25.  That is wrong.  The Trade Representative's exercise of judgment to exclude enteral syringes does not alter the importance of the tariff to obtain the elimination of China's unfair trade practices that are burdening U.S. commerce.

*Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1349 (Ct. Int'l Trade 2020)). However, the APA does not apply and, even if it did, the Trade Representative addressed significant comments made by interested parties, including Retractable.

The APA does not apply where a "foreign affairs function" is "involved." 5 U.S.C. § 553(a)(1). The Trade Representative's decisionmaking under section 301 involves quintessential foreign-affairs functions. When deciding what action is "appropriate and feasible" under section 301, the Trade Representative has discretion (subject to the President's direction) to choose among *any* action authorized under section 2411(c)—including imposing duties or "enter[ing] into binding agreements" with the foreign country concerned. 19 U.S.C. § 2411(b), (c)(1)(B), (D). The Trade Representative's decision regarding which "action" is "appropriate and feasible" involves a foreign-affair function that is not subject to APA requirements. 19 U.S.C. § 2411(b); 5 U.S.C. § 553(a)(1). Subjecting such choices to APA procedures would "provoke definitely undesirable international consequences." *See Am. Ass'n of Exps. & Imps.*, 751 F.2d at 1249 (quoting H.R. Rep. No. 79-1980 at 257). Consistent with this understanding, Congress provided for *alternative* procedures for undertaking section 301 actions and modifications to such actions—including consultation with the representatives of the domestic industry and the opportunity for presentation of views by interested persons. *See, e.g.*, 19 U.S.C. § 2417(a)(2); *but see In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1336-1337 (Ct. Int'l Trade 2022) (holding the foreign affairs function did not apply).

Regardless, the Trade Representative responded to significant comments by Retractable and others. As the Trade Representative explained in adopting the modification, the "categories of products" subject to new or additional section 301 duties—including syringes and needles—reflected "products targeted by China for dominance and/or sectors where the U.S. recently made

significant domestic investments." Ex. 30 at 3-4, 9. The Trade Representative exercised its "predictive judgment" that targeting such products would incentivize "China to eliminate the investigated acts, policies, and practices, and mitigating possible harm to the U.S. economy." *Id.* at 7, 9.

Retractable's declarations confirm that needles and syringes fall into the category involving recent "significant domestic investments" by the United States. *See id.*; *see also* Shaw Decl. ¶ 28. Indeed, the declarations reflect millions of dollars in Federal Government investment into Retractable's domestic manufacturing facility. Shaw Decl. ¶ 28; *see also* Exs. 5, 6, 9. Retractable concedes that the same basis provides sufficient reasoning when applied to face masks and medical gloves. *See* Pl. Mot. at 16 (describing the investment in those products).

Retractable nevertheless asserts error, arguing that a comment by the American Hospital Association asking to delay or avoid tariffs on "health care goods" went "unheeded." Pl. Mot. at 23. But the APA does not mandate *agreement* with significant comments—rather, only reasoned decisionmaking is required. *In re Section 301 Cases*, 628 F. Supp. 3d 1235, 1241 (Ct. Int'l Trade 2023) (citing *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003)).[28]

In any event, the Trade Representative addressed comments that increasing duties on health care goods would raise medical care costs and impact patient care.[29] Ex. 30 at 22. For example, the Trade Representative explained that "increasing tariffs on facemasks will

---

[28] Retractable also fails to recognize that the Trade Representative *did* act based on the American Hospital Association's concerns about the lack of domestic manufacturers of enteral syringes, which received special treatment in the final modification.

[29] For example, the Trade Representative addressed comments that (1) concerns about the availability of facemasks outside of China and possible disruption to the supply of facemasks and higher costs for healthcare providers, (2) "increasing duties on medical gloves will raise medical care costs and impact patient care," and (3) comments noting that prices for syringes and needles "would likely increase." Ex. 30.

encourage diversification away from China, improve supply chain resiliency, and create greater leverage with China to eliminate the investigated acts, policies, and practices." Ex. 30 at 11. Similarly, the increased tariff on medical gloves was "warranted, considering the expected increase in U.S. and third-country sources," and would "provide additional leverage with China to eliminate the investigated acts, policies, and practices." *Id.* at 13-14. Finally, the Trade Representative explained that "syringes and needles are critical to U.S. preparedness in responding to public health emergencies" and highlight the "need to maintain alternative sources." *Id.* at 22.

Further, similar concerns were raised during the earlier consultation period from October 2022 to January 2023. *See* Ex. 16 (Appendix A, public comment). Addressing considerations of cost and supply chain resilience, the Trade Representative explained that "reducing exposure to risk and shocks associated with supply chain concentration may increase sourcing flexibility and resilience." Ex. 16 at 81 (citation omitted). Although "this process may generate costs relative to continued reliance on existing supply chain structures and resilience is at present difficult to measure, improvements in supply chain transparency and security resulting from increased resilience may exceed adjustment costs over the long run." *Id.* (citations omitted).

Finally, Retractable is simply incorrect in claiming that the Trade Representative relied on comments or analysis from a different docket addressing supply chain resilience. *See* Pl. Mot. at 25, 20. Nothing supports Retractable's assertion that the Trade Representative relied on the separate docket on "Promoting Supply Chain Resilience." Instead, supply chain resilience was considered from the outset of the four-year review, long before March 7, 2024, when Retractable alleges the Trade Representative opened that separate docket. Compl. ¶ 106.

The Trade Representative addressed supply chain resilience throughout the four-year

review, but did not rely on the separate docket cited by Retractable. *See, e.g.*, Ex. 13 (October 2022). For example, the Trade Representative addressed supply chain considerations in the October 2022 notice, Ex. 13 at 4, the report and recommendation to the President, Ex. 16 at 81-82, the notice of proposed modification, Ex. 17 at 4, and the final modification, Ex. 30 at 22, 24. In doing so, the Trade Representative did not rely on other dockets, but rather on information collected and reviewed during the Section 301 process.

      D.      <u>The Balance Of Hardships And Public Interest Favor Denial</u>

The last two equitable factors—the balance of the hardships and public interest—likewise weigh in favor of denying plaintiffs' motion. These two factors for equitable relief "merge when the Government is the opposing party." *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009) (addressing public interest and balance of harms in considering a stay).

The relief requested by Retractable is not in the public interest and instead would undercut the section 301 action designed to obtain the elimination of China's unfair practices that burden United States commerce. Ex 30. The President found that "additional section 301 tariffs would provide incentives for China to eliminate the acts, policies, and practices at issue." Ex. 17. Retractable's request to import millions of dollars of merchandise without paying the applicable tariffs would undermine those incentives. In short, the requested preliminary injunction would weaken the effectiveness of the Trade Representative's chosen method to obtain the elimination of China's unfair practices.

Although Retractable insists that the United States will recover the owed duties *later* if the Government prevails, that still represents—at best—a delay in the effort to eliminate China's unfair trade practices. Nor is it apparent that Retractable actually *could* pay the duties at the end of the case, if its allegations regarding its financial picture are true. If Retractable faces

CONFIDENTIAL MATERIAL OMITTED

insolvency *after* importing the merchandise, the United States may never recover the applicable tariffs, further harming the public interest.

Moreover, although Retractable is only one company, its concerns about cost and competitiveness are far from unique. In considering the public interest, the Court should also consider the broader implications if the thousands of other companies subject to similar tariffs requested the same relief.

In claiming that the equities favor its requested relief, Retractable raises a variety of policy arguments that merely second-guess the President's and Trade Representative's judgment that the section 301 action is appropriate to obtain the elimination of China's unfair practices. Pl. Mot. at 25-26. Retractable argues, for example, that granting the preliminary injunction will help maintain "a diverse, competitive market for essential medical supplies" and "preserv[e] domestic production capabilities." *Id.* These arguments ask the Court to step into the shoes of the President and the Trade Representative in assessing the effectiveness of the section 301 remedy and the appropriate action to obtain the elimination of China's unfair trade practices. That is not this Court's role. Retractable's requested relief would undermine the effectiveness of the Trade Representative's chosen action to obtain the elimination of China's unfair trade practices and the resulting burden on the United States economy. Thus, the equitable factors weigh against granting Retractable's request for preliminary injunctive relief.

E.    <u>USCIT Rule 65(c) Security Is Required</u>

Finally, if the Court nonetheless entertains Retractable's motion for preliminary injunction, it should require Retractable to post a [[ ▮▮▮▮▮ ]] bond—and to notify the Court in advance if the value of Retractable's imports is about to exceed that amount. "{T}he court may issue a preliminary injunction or a temporary restraining order *only* if the movant gives

CONFIDENTIAL MATERIAL OMITTED

security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  R. Ct. Int'l Trade 65(c) (emphasis added).

In this case, the "security" required by Rule 65(c) must account for the risk that Retractable could enter millions of dollars in merchandise during the pendency of the case and (if it loses), be unable or unwilling to pay.  Over the last nine months alone, Retractable has imported [[ ███████ ]] from China.  Ex. 31, Amstutz Decl. ¶ 10.  Projecting that amount over one year—a reasonable estimate of the length of litigation on the merits—demonstrates that a bond of [[ ███████ ]] is necessary security in this case.  We also respectfully request that if the Court issues any preliminary injunction, the Court require Retractable to notify defendants and the Court when the total volume of its imports approaches the amount of the bond—to ensure an adequate opportunity to increase the bond if necessary.

## **<u>CONCLUSION</u>**

For these reasons, we respectfully request that the Court dismiss the complaint and deny Retractable's motion for a preliminary injunction.

OF COUNSEL

MEGAN M. GRIMBALL
PHILIP A. BUTLER
Office of the United States Trade
Representative


EMMA L. TINER
International Trade Litigation
Office of the Assistant Chief Counsel
U.S. Customs and Border Protection


October 15, 2024

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

EMMA E. BOND
Senior Trial Counsel
U.S. Department of Justice, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-2034
Email: Emma.E.Bond@usdoj.gov

*Attorneys for Defendants*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains no more than 13,333 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Emma E. Bond

| Exhibit | Document |
|---------|----------|
| 1 | *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 28,710 (U.S. Trade Representative Jun. 20, 2018). |
| 2 | *Notice of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 40,823 (U.S. Trade Representative Aug. 16, 2018). |
| 3 | *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 83 Fed. Reg. 47,974 (Sep. 21, 2018) |
| 4 | *Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 84 Fed. Reg. 43,304 (U.S. Trade Representative Aug. 20, 2019). |
| 5 | *BARDA Announcement: Becton Dickinson to expand domestic manufacturing capacity for needles and syringes* (July 9, 2020) |
| 6 | *BARDA Announcement: Retractable Technologies* (July 9, 2020) |
| 7 | Executive Order 140001 on A Sustainable Public Health Supply Chain, 86 Fed. Reg. 7,219 (Jan. 21, 2021) |
| 8 | Executive Order 14017 on America's Supply Chains, 86 Fed. Reg. 11,849 (Feb. 24, 2021) |
| 9 | *DOD & HHS Announce DPA Title III Agreement With Retractable Technologies, Inc. to Expand Domestic Production Capacity for Low Dead-Space Safety Syringes and Needles* (May 21, 2021) |
| 10 | *Building Resilient Supply Chains, Revitalizing American Manufacturing, and Fostering Broad-Based Growth, 100-Day Reviews under Executive Order 14017*, Department of Commerce Department of Energy Department of Defense Department of Health and Human Services (June 2021) |
| 11 | *Initiation of Four-Year Review Process: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 26,797 (U.S. Trade Representative, May 5, 2022) |
| 12 | *Continuation of Actions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 87 Fed. Reg. 55,073 (U.S. Trade Representative, Sept. 8, 2022) |
| 13 | *Request for Comments in Four-Year Review of Actions Taken in the Section 301 Investigation: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* |

| | |
|---|---|
| | 87 Fed. Reg. 62,914 (U.S. Trade Representative, Oct. 17, 2022), and Four-Year Review Docket Questionnaire |
| 14 | Becton Dickinson Comment, USTR-2022-0014-00035324 (Jan. 17, 2023) |
| 15 | Memorandum for the United States Trade Representative, *Memorandum on Actions by the United States Related to the Statutory 4-Year Review of the Section 301 Investigation of China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation* (May 14, 2024) |
| 16 | *Four-Year Review of Actions Taken in the Section 301 Investigation: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, U.S. Trade Representative (May 14, 2024) |
| 17 | *Request for Comments on Proposed Modifications and Machinery Exclusion Process in Four-Year Review of Actions Taken in the Section 301 Investigation: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 89 Fed. Reg. 46,252 (U.S. Trade Representative, May 28, 2024) |
| 18 | Avanos Medical, Inc. Comment, USTR-2024-0007-00106953 (June 12, 2024) |
| 19 | The Oley Foundation, Inc. Comment, USTR-2024-0007-00107057 (June 17, 2024) |
| 20 | DoubleLock Healthcare, Inc., USTR-2024-0007-00107162 (June 20, 2024) |
| 21 | Premier, Inc. Comment, USTR-2024-0007-00107236 (June 21, 2024) |
| 22 | Global Enteral Device Supplier Association Comment, USTR-2024-0007-00107259 (June 23, 2024) |
| 23 | Springzyk Comment, USTR-2024-0007-00107823 (June 27, 2024) |
| 24 | Retractable Technologies, Inc. Comment, USTR-2024-0007-00108478 (June 28, 2024) |
| 25 | Becton Dickinson Comment, USTR-2024-0007-00108103 (June 28, 2024) |
| 26 | Federation of American Hospitals Comment, USTR-2024-0007-00108191 (June 28, 2024) |
| 27 | Baxter Healthcare Corporation Comment, USTR-2024-0007-00108169 (June 28, 2024) |
| 28 | American Medical Manufacturers Association Comment, USTR-2024-0007-00107987 (June 28, 2024) |
| 29 | ECRI Comment, USTR-2024-0007-00107943 (June 28, 2024) |
| 30 | *Notice of Modification: China's Acts, Policies and Practices Related to Technology Transfer, Intellectual Property and Innovation*, 89 Fed. Reg. 76,581 (U.S. Trade Representative September 18, 2024) |
| 31 | Public Amstutz Declaration (Oct. 7, 2024) |

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:    THE HONORABLE CLAIRE R. KELLY, JUDGE**

|  |  |
|---|---|
| RETRACTABLE TECHNOLOGIES, INC., ) | |
| ) | Ct. No. 24-00185 |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| UNITED STATES, et al., ) | |
| ) | |
| Defendants. ) | |

<u>**ORDER**</u>

Upon consideration of defendants' motion to dismiss and all other pertinent papers, it is hereby

**ORDERED** that the motion is granted; and it is further

**ORDERED** that the case is dismissed.

**SO ORDERED.**

_____
JUDGE

Dated:_____, 2024
      New York, NY