UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: CLAIRE R. KELLY

-----------------------------------------------------------------X

RETRACTABLE TECHNOLOGIES, INC.,

                            Plaintiff,

                            v.                        Court No. 24-00185

UNITED STATES OF AMERICA;
OFFICE OF THE UNITED STATES TRADE
REPRESENTATIVE; KATHERINE TAI TRADE
REPRESENTATIVE; UNITED STATES CUSTOMS
& BORDER PROTECTION; TROY MILLER, in his
capacity as Senior Official Performing the Duties of
Commissioner, U.S. Customs & Border Protection,

                            Defendants.

**PLAINTIFF'S POST-HEARING BRIEF**

-----------------------------------------------------------------X

## PRELIMINARY STATEMENT

      As directed by the Court, [Dkt. 51], Retractable respectfully submits this memorandum summarizing the testimony and evidence adduced at the October 17, 2024 hearing. The evidence supports a clear likelihood of irreparable harm to Retractable absent an injunction. The imposition of this tariff without sufficient time to adjust its supply chain will cause Retractable to suffer losses in excess of the duties it will pay. Such losses include, among others, lost sales, lost customers, contractual penalties, lost opportunities to invest in new products, and the potential loss of the business as an ongoing enterprise.

## ARGUMENT

**I.    Retractable Will Suffer Irreparable Harm Absent an Injunction**

      Irreparable harm is harm without adequate later remedy. The key is "the available remedy." *KWV, Inc. v. United States*, 108 Fed. Cl. 448, 457 (Fed. Cl. 2013). Unrecoverable money loss

1

constitutes irreparable harm. *Michael Stapleton Assocs. v. United States*, 161 Fed. Cl. 151, 158 (Fed. Cl. 2022). This Court grants injunctive relief for unrecoverable damages when remedy uncertainty exists. *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1362 (Ct. Int'l Trade 2021); *Qingdao Taifa Group Co. v. United States*, 581 F.3d 1375, 1380 (Fed.Cir.2009). Here, Retractable's remedy would be limited to tariff refunds.

A "cognizable danger" suffices to show likelihood of irreparable harm. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1963); *Sunpreme v. U.S.*, CIT 181 F. Supp. 1372 (2016). A "viable threat" of serious harm warrants injunction. *Zenith Radio Corp.*; *Celsis In Vitro v. CellzDirect*, 664 F.3d 922 (Fed.Cir.2012). Retractable's evidence shows such immediate threat.

Retractable's evidence demonstrates three harm categories: (1) quantifiable but unrecoverable financial losses; (2) unquantifiable financial losses; and (3) non-financial losses. These exceed recoverable duties/tariffs. Without injunction, Retractable must either discontinue 95% of business or suffer non-recoupable damages. (Hearing Tr. 20:13-15).

### 1. Immediate Threat of Non-Recoverable Financial Losses

Without injunction, Retractable faces irreparable contractual losses and lost customers. Per Larios, customer agreements require Retractable to pay price differences if customers must purchase from competitors at premium prices due to Retractable's delivery failure. (Hearing Tr. 120:6-13). Such losses are irreparable. *XYZ Corp. v. United States*, 253 F. Supp. 3d 1257, 1270 (Ct. Int'l Trade 2017).

Larios testified price increases would cause customer loss and force contract termination/renegotiation. (Hearing Tr. 119:9-12). Courts recognize "damage to customer confidence and relationships" as irreparable harm warranting injunction. *CPC Int'l v. United States*,

896 F.Supp. 1240, 1243 (Ct. Int'l Trade 1995); *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1369 (Fed.Cir.2017).

Retractable would also suffer losses in clinical training investment. This requires "significant personnel" for "in-servicing" clinical staff. (Hearing Tr. 122:17-21). Retraining personnel of returning customers creates "resistance" (Hearing Tr. 122:22-23, 123:6). Lervisit confirmed extensive training requirements needing "a team of clinical educators." (Hearing Tr. 154:19-20, 156:15).

### 2. Threat of Business Disruption and Non-Quantifiable Financial Losses

Fundamental business alteration required by challenged Government action constitutes irreparable harm. *Corus Group PLC v. Bush*, 217 F.Supp.2d 1347, 1354 (Ct. Int'l Trade 2022). Larios and Shaw testified to major disruption from running three new production lines under tariff. Larios noted high skilled labor requirements and costly personnel needs for line operation. (Hearing Tr. 124:23 – 125:3). Sequential work efficiencies would be lost. Shaw described need to "hire ninety people" and "train them all at once" to optimize "scrap rate," calling it "unrealistic" and "total chaos." (Hearing Tr. 106:4-14). Such disruption constitutes irreparable harm. *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed.Cir.1996).

### 3. Non-Financial Market Opportunity and Business Loss

It is well-settled that "loss of goodwill, damage to reputation and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed.Cir.2012). Larios testified that Retractable has considered putting customers "on restrictions so that they can only buy what they purchased the prior year . . ., which . . . affects us immediately and for the going-forward future." (Hearing Tr. 119:4-9). She further testified "we're having to sell the product at a loss, you can only do that for so long."

(Hearing Tr. 119:13-16). Mr. Shaw further testified that the tariff will delay Retractable's launch of three new syringe products by at least a year, preventing Retractable's plan to enter the home market and frustrating his plan to bail the company out in a post-pandemic market. This is textbook irreparable harm. *Polymer Technologies, Inc. v. Bridwell,* 103 F.3d 970, 975-76 (Fed.Cir.1996) (loss of market opportunities cannot be quantified or adequately compensated and is irreparable harm).

As noted above, several Retractable witnesses testified that if Retractable cannot supply the 0.5mL insulin syringe, it will lose its customers. Mr. Shaw testified that due to the immediate impact of the tariff, Retractable's Chinese supplier is "screaming at me every night what are they going to do . . . because they're being driven out of business." (Hearing Tr. 105:8-12). He emphasized that Retractable understands the intent of the tariffs to "get the United States independent," but noted: "The question is the timeline." (Hearing Tr. 105:16-17). In essence, the two-week tariff timeline means, Retractable may lose its only source of 0.5ml insulin syringes for a year, while it attempts to create domestic production. This would destroy the company's syringe business, regardless of any insolvency. As Shaw testified "In theory we could close the doors . . . and just live on selling off the assets and investments . . . but I don't see . . . the purpose." (Hearing Tr. 108:13-109:2).

## II.     The Government's Contentions Largely Miss the Point

The Government's contentions regarding Retractable's supposed "business judgments" largely miss the point that the amount and timing of the tariff here are a source of irreparable harm. The Government contends that because Retractable identified supply chain and tariff risks in its financial statements, that it would have known that it would be subject to a one hundred percent tariff on two weeks' notice. This is not supported by Retractable's financial statements and beggars

4

common sense. In fact, the financial statements identify several risks, all of which Retractable attempted to balance in running its business. Similarly, the Government complains that Retractable reduced its domestic manufacturing payroll. As Retractable witnesses repeatedly testified, the layoffs occurred during a time of steep decline in demand for vaccine syringes. Had Retractable retained non-productive workforce, the Government would instead be faulting it for incurring operating losses. The Government also contends that Retractable could sell sufficient syringes to offset its operating losses. This contention misses two critical points: (1) Retractable cannot create market demand for syringes; and (2) increasing syringe manufacturing would also increase operating losses. Finally, the Government contends Retractable must show imminent insolvency to demonstrate irreparable harm. This contention is not supported under controlling precedent and far overstates Retractable's burden to show harm as demonstrated above.

## SUMMARY OF HEARING TESTIMONY

Shaw received grants from the National Institutes of Health in the late 1980s to develop "the world's first effective retractable syringe." (Hearing Tr. 72:22-73:1). While clinicians wanted the product, Shaw was unable to interest large syringe manufacturers because of associated costs "to re-buy literally billions of dollars' worth of molds and billions of dollars' worth of assembly equipment in order to supply the [$55 billion] market." (Hearing Tr. 73:10 – 74:2). Thus, Shaw could not interest the "major manufacturer" (i.e. Beckton, Dickinson and Company ("BD")) in his retractable syringe. Shaw also could not interest any lenders or brokerage firms to work with Retractable as none of them wanted to go against BD's interests. (Hearing Tr. 74:20 – 76:15). Therefore, Shaw sought private investors, receiving about ▮▮▮▮▮ per investor and offering ten percent rates of return to attract private investment. (Hearing Tr. 74:12-19). Shaw founded Retractable in 1997 and took it public "around 2002." (Hearing Tr. 81:5-8).

Retractable struggled as a company. Shaw "had a lot of stress and a lot of struggle in order to keep the company alive." (Hearing Tr. 81:11-12). He testified that Retractable did not run a profit "for 20 year[s]," "all the way up until 2019." (Hearing Tr. 81:11-17). Retractable's Chief Financial Officer also testified: "for the majority of the history of the company, [] we have had operating losses." (Hearing Tr. 17:20-21). Retractable had its first profitable year in 2019, (Hearing Tr. 18:1-3), and "[e]xcluding the COVID years," its CFO could not "recall us ever having a net profit or a net income or a profit from operations." (Hearing Tr. 27:18-20). The company was effectively funded from ▮. (Hearing Tr. 82:1-9).

During this time, the company also developed ties to a supplier in China, Jumin Bio-Technologies ("Jumin"). It took several years to train Jumin's manufacturing capabilities so that it could work with Retractable. (Hearing Tr. 78:15). The process for manufacturing Retractable's syringes is complex: it requires maintaining tolerances "about one-sixth of the human hair in diameter," (Hearing Tr. 78:25 – 79:1), precise temperatures and pressures, (Hearing Tr. 79: 3-12), and "constant testing," (Hearing Tr. 79:13, 18, 24-25). Retractable and Jumin have successfully made over two billion syringes over a more than twenty-year relationship. *Id.*

Both Shaw and Larios testified about Retractable's efforts to create manufacturing facilities outside of China. Shaw testified that "we had several discussions with people in Arab countries; they backed out [due in part to a] minimum ▮ on their part." (Hearing Tr. 80:7-9). Larios testified that in 2018 Shaw "purchased a building [in Brazil] and had a business plan in place." (Hearing Tr. 115:14-15). The plan required "extensive" required capital outlays "in the neighborhood of 50 to 80 million," and was not feasible. (Hearing Tr. 116:14-18). Larios also testified to regulatory requirements requiring registration for manufacturing facilities, (Hearing Tr. 117: 13-17), facility testing to "demonstrate the particulate numbers and the adequate filtration for

a controlled environment production," (Hearing Tr. 117:24-25), a "validation process" for "each mold for each part," and "heavy testing" of the final product. (Hearing Tr. 118:1-13).[1]

With the onset of the COVID 19 pandemic, Retractable became a critical supplier to the United States government, which "ordered hundreds of millions" of syringes. (Hearing Tr. 18:18-19). Retractable sold "470 million" vaccination syringes to the government (selling "700 million" total) during the COVID-19 pandemic. (Hearing Tr. 87:18-19). The government approached Retractable to invest in Retractable's domestic capacity, (Hearing Tr. 88:7-14), to manufacture vaccination syringes for a pandemic, (Hearing Tr. 88:24 – 89:5). The "complexity" of the project was "unbelievable," "massive," and "exhausting." (Hearing Tr. 93:1-5). Retractable now has ten-year obligations for machine maintenance and is incurring depreciation, maintenance, extra staff requirements, and increased overhead. (Hearing Tr. 90:5-20). From 2020 to 2023, Retractable's "time," "efforts," and "energies" were directed "to the delivery order for HHS" and the machines, (Hearing Tr. 70:17-20), not creating domestic 0.5mL insulin syringe manufacturing.

After the pandemic, "government orders have ceased," the company has "seen a decline in customers ordering for vaccination efforts," and some customers have taken steps "to back off of their orders." (Hearing Tr. 19:1-7). In the post-pandemic environment, Retractable's 0.5mL insulin syringe is its "most important product." (Hearing Tr. 155:10-18). Mr. Lervisit testified that from January to July of 2024, Retractable had a "year-on-year increase of almost 30 percent for that half ml." (Hearing Tr. 155:18). Mr. Fort testified that the 0.5 milliliter insulin syringes "are very important to the company." (Hearing Tr. 20:5-6). Mr. Shaw testified that Retractable would lose customers unless it can offer a "full line" of products. (Hearing Tr. 84:12-16). Mr. Lervisit stated

---

[1] Jumin is "register[ed] with the FDA as a contract manufacturer and a contract sterilizer." (Hearing Tr. 113:12-13).

7

Retractable would lose customers and be unable to compete for new customers without product, (Hearing Tr. 163:22-25). He noted that a "lot of [new] customers want our half ml syringe," (Hearing Tr. 164:2-3), which Retractable must import, (Hearing Tr. 107:7-23).

Mr. Shaw gave detailed testimony about why it would take at least a year for Retractable to manufacture the 0.5mL insulin syringe domestically: "we have to have highly trained, efficient people for three shifts to run three different machines that have never seen them before . . . . This is a tremendous burden on us to not have at least next year to do this." (Hearing Tr. 107:7-23). Larios testified that Retractable will "have to sell at a loss because we're restricted from changing pricing during a period of time." *Accord*, (Hearing Tr. 43:18-19, Fort testimony that the cost of manufactured product with tariff will "exceed our expected sales price"); (Hearing Tr. 159:11-13, Lervisit testimony that "[t]he price or the cost of the product plus the tariff would be higher than the contract price in some instances"). ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (Hearing Tr. 119:20-24). ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (Hearing Tr. 120:16-17). ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (Pl.'s Ex. 15). ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (Hearing Tr. 35:8-9).

Anticipating a post-pandemic demand slump for vaccine syringes, Mr. Shaw began research and development on three new syringe products years ago. (Hearing Tr. 94:20-23, 96:18-97:12). He planned to put ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ toward product development and launch. (Hearing Tr. 97:6-9). The new products were intended to "bail [] out" the company by giving Retractable access to the "[home] market" rather than battling for sales in a hospital market

that it is "foreclosed from." (Hearing Tr. 96:18-19, 97:11-12). But instead, this money is "going to be used up in tariffs." (Hearing Tr. 96:4-5).

Several Retractable witnesses testified regarding the impact of the tariff's timing on the company. Mr. Lervisit testified that Retractable first became aware of potential future syringe and needle tariffs on May 14, 2024. (Hearing Tr. 138:5-8). At this time, the President had directed a tariff of at least fifty percent in 2024. (Pl.'s Ex. 8). The reaction at Retractable was "panic," even with an only fifty percent tariff on the horizon. (Hearing Tr. 139:4-14). Retractable immediately began a one-year project to convert a legacy machine to produce 0.5mL insulin syringes. (Hearing Tr. 97:23-25). (Among other costs, this is projected to add annual payroll expense of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Thereafter, on September 18, 2024, USTR announced a *100 percent* tariff on syringes and needles, to become effective in *less than two weeks*. (Pl.'s Ex. 12). Mr. Lervisit testified the company assumed it would be "notified" before being subject to such a tariff. (Hearing Tr. 166:15). Retractable's general counsel testified to the "impossible task to try and sustain the cost of the tariff while sustaining the cost of what it's going to take to get these [0.5 mL production] lines up and running." (Hearing Tr. 124:4-6). She explained how this timeline would impact Retractable's "decisions about what to order and what to pay tariffs on in order to try and minimize our losses." (Hearing Tr. 124:8-10). Finally, both Larios and Shaw testified about the "significant cost" and "tremendous burden" of efficiency losses caused by trying to bring three production lines up in short order. (Hearing Tr. 107:13-20; 125:4-10). Fort testified about the "very tough decisions in terms of . . . who we are actually going to employ" to account for the increased payroll for this manufacturing project. (Hearing Tr. 46:7-11).

Witnesses also testified to Retractable's challenges as a small player in a monopolized business. Lervisit discussed comments filed with the USTR by Retractable's second largest

9

distributor (Medline) and an association whose members use Retractable's products (American Health Care Association) both expressing fears of a tariff driven syringe and needle monopoly. (Hearing Tr. 144:14-16, 147:15-23). These factors and the immediacy and amount of the tariff will cause Retractable irreparable harm absent an injunction.

## CONCLUSION

For the foregoing reasons, the Preliminary Injunction should be granted pending resolution of this matter on the merits.

Dated: October 22, 2024

New York, New York

Respectfully submitted,

| | |
|---|---|
| **ROMANO LAW PLLC** | **BARNES RICHARDSON & COLBURN, LLP** |
| By: /s/Siddartha Rao | By: /s/Lawrence Friedman |
|     Siddartha Rao |     Lawrence M. Friedman |
|     Danielle Yurkew | 303 East Wacker Drive Ste. 305 |
|     (admission pending) | Chicago, IL 60601 |
|     Curtis Fuller | Phone: (312) 297-9554 |
|     (admission pending) | Email: lfriedman@barnesrichardson.com |
| One Battery Park Plaza, 7th Floor | |
| New York, NY 10004 | |
| Phone: (212) 865-9848 | |
| Email: sid@romanolaw.com | *Local Counsel for Plaintiff* |
| | *Retractable Technologies, Inc.* |
| *Counsel for Plaintiff* | |
| *Retractable Technologies, Inc.* | |