**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| RETRACTABLE TECHNOLOGIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA; OFFICE | ) |
| OF THE UNITED STATES TRADE | ) |
| REPRESENTATIVE; KATHERINE TAI | )     Court No. 24-00185 |
| TRADE REPRESENTATIVE; UNITED | )     PUBLIC VERSION |
| STATES CUSTOMS & BORDER | ) |
| PROTECTION; TROY MILLER, in his | )     CONFIDENTIAL MATERIAL |
| capacity as Senior Official Performing the | )     OMITTED FROM PAGES 3, 5, 10 |
| Duties of Commissioner, U.S. Customs & | ) |
| Border Protection, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' POST-HEARING BRIEF**

OF COUNSEL

MEGAN M. GRIMBALL
PHILIP A. BUTLER
Associate General Counsel
Office of the United States Trade
Representative


EMMA L. TINER
Attorney
International Trade Litigation
Office of the Assistant Chief Counsel
U.S. Customs and Border Protection

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

EMMA E. BOND
Senior Trial Counsel
U.S. Department of Justice, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-2034
Email: Emma.E.Bond@usdoj.gov

October 22, 2024

*Attorneys for Defendants*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................... 1

I.     The Court Need Not Reach Irreparable Harm Because The Complaint Should Be Dismissed Pursuant To Rules 12(b)(1) and 12(b)(6) ....................................... 1

II.     The Testimony At The Hearing Demonstrates That Retractable Will Not Experience Irreparable Harm Absent The Requested Preliminary Injunction ....... 2

     A.     Retractable Fails To Identify Any Immediate, Irreparable Harm That Could Not Be Redressed By A Favorable Ruling On The Merits ............. 2

     B.     Retractable's Proposed Relief Would Alter The Status Quo—Thus Requiring A Heightened Showing Of Harm That Retractable Is Unable To Meet ............................................................................................................. 3

          1.     Retractable Does Not Face Immediate Extinction ........................... 5

          2.     After More Than $80 Million In Investment By The Federal Government, Retractable Has Viable Alternatives To Importing The Majority Of Its Merchandise From China .............................. 5

          3.     Retractable Could Reduce Executive Pay ....................................... 8

          4.     Retractable's Concerns About Cutting Its Product Line Do Not Establish Irreparable Harm ......................................................... 8

III.     Granting A Preliminary Injunction In This Case Is Contrary To The Public Interest ..................................................................................................................... 9

IV.     USCIT Rule 65(c) Security Is Required ............................................................. 10

CONCLUSION ..................................................................................................................... 10

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Belgium v. United States*,
   452 F.3d 1289 (Fed. Cir. 2006)............................................................................................ 3

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations*
*v. United States*,
   393 F. Supp. 3d 1271 (Ct. Int'l Trade 2019) ..................................................................... 2, 3

*In re Section 301 Cases*,
   524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021) ......................................................................... 9

*Queen's Flowers de Colombia v. United States, (Queen's Flowers*),
   947 F. Supp. 503 (Ct. Int'l Trade 1996) ................................................................................ 5

*Shree Rama Enterprises v. United States*,
   983 F. Supp. 192 (Ct. Int'l Trade 1997) ................................................................................ 4

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
   60 F.3d 27 (2d Cir. 1995)....................................................................................................... 4

*U.S. Ass'n of Importers of Textiles & Apparel v. U.S. Dep't of, Com.*,
   413 F.3d 1344 (Fed. Cir. 2005)............................................................................................. 1

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981)............................................................................................................... 4

<u>INTRODUCTION</u>

The testimony at the October 17, 2024 hearing confirmed that plaintiff, Retractable Technologies, Inc. (Retractable), will not suffer imminent, irreparable harm from the imposition of section 301 tariffs absent a preliminary injunction. *See* 19 U.S.C. §§ 2411, 2417. Instead, Retractable's witnesses testified that Retractable has a strong balance sheet and can choose among a number of options to absorb the section 301 duties or minimize the duties by increasing production at its domestic production facility. To the extent Retractable has shown that it might experience economic loss over the next year, such garden variety economic loss could be present in any case involving imposition of tariffs and does not establish irreparable harm.

I.    The Court Need Not Reach Irreparable Harm Because The Complaint Should Be
      <u>Dismissed Pursuant To Rules 12(b)(1) and 12(b)(6)</u>

As an initial matter, the Court need not address the question of irreparable harm because the complaint should be dismissed for lack of jurisdiction and failure to state a claim. *See* Defs. Mot. at 15-27, ECF 39.

"The question of jurisdiction closely affects" the likelihood of success on the merits of a motion for preliminary injunction. *U.S. Ass'n of Importers of Textiles & Apparel v. U.S. Dep't of Com.*, 413 F.3d 1344, 1348 (Fed. Cir. 2005). Failure to consider jurisdiction before issuing a preliminary injunction amounts to "legal error." *Id.* The failure to state a "plausible" claim for relief pursuant to Rule 12(b)(6) likewise prevents the plaintiff from satisfying the "higher burden" of showing likelihood of success on the merits. *See, e.g.*, *Action NC v. Strach*, 216 F. Supp. 3d 597, 628 (M.D.N.C. 2016) (finding no likelihood of success on the merits despite plaintiffs stating a plausible claim for relief). The defendants' arguments regarding dismissal under Rules 12(b)(1) and 12(b)(6) thus demonstrate that Retractable is not likely to succeed in

this litigation.  *See* Defs. Mot. at 15-27, ECF No. 39.  Retractable's motion should be denied on this basis alone.

II.    **The Testimony At The Hearing Demonstrates That Retractable Will Not Experience Irreparable Harm Absent The Requested Preliminary Injunction**

If the Court nonetheless reaches the question of irreparable harm, the evidence demonstrates that Retractable will not experience irreparable harm before a decision can be reached on the merits of the case.  "In evaluating irreparable harm, the court must consider 'the magnitude of the injury, the immediacy of the injury, and the inadequacy of future corrective relief.'"  *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 393 F. Supp. 3d 1271, 1276 (Ct. Int'l Trade 2019) (*Lumber*) (citations and alteration omitted).  "It is not enough to establish 'a mere possibility of injury, even where prospective injury is great.  A presently existing, actual threat must be shown.'"  *Id*. (citations omitted).  Applying this standard, Retractable has failed to demonstrate immediate, irreparable harm will occur before the Court decides the merits of the case.

A.    **Retractable Fails To Identify Any Immediate, Irreparable Harm That Could Not Be Redressed By A Favorable Ruling On The Merits**

Retractable has sufficient cash and investments to pay the tariffs over the next year.  *See, e.g.,* DX 8 at 1, ECF 27-9 at 3.  Thus, Retractable fails to show that the possibility of future relief on the merits—including potential reliquidation—would provide inadequate "corrective relief." *Lumber*, 393 F. Supp. 3d at 1276.[1]

Retractable's strong balance sheet shows that even without any other change to its

---

[1]  To be clear, Retractable is not entitled to relief on the merits.  *See* Defs. Mot. at 16-27, 34-40, ECF 39.  For purposes of assessing irreparable harm in the context of a motion for preliminary injunction, however, the question is whether Retractable has established immediate, irreparable harm that *could not be* remedied by a future ruling on the merits in its favor.

business model, it has the cash and investments to pay the tariffs over the next year. The chief financial officer, John Fort, testified that Retractable has a "strong balance sheet." Tr. 36:22-24, Tr. 38:21-24. As of June 2024, Retractable had approximately [ ██████ ] in cash and cash equivalents. DX 8 at 1 (balance sheet). At the same time, Retractable also had approximately [ ██████ ] in investments, including debt and equity securities. *Id.* Retractable's investments have since increased to approximately [ ██████ ], as of September 2024. Tr. 38:16-20. Thus, even if Retractable were to replicate its recent average monthly dollar value of imports over the next twelve months—totaling roughly [ ██████ ]—Retractable's investments would be sufficient to cover 100 percent duties on those imports. *See* DX 23 at 1, ECF 49 at 1 (listing the Chinese import values from 2024 to date); DX 8 at 1 (balance sheet); *see also* Section IV (projecting import values on an annual basis).

Given the availability of funds to cover the amount of duties over the next year, Retractable cannot show that potential "corrective relief" would be inadequate. *Lumber*, 393 F. Supp. 3d at 1276. As explained in an earlier filing, the United States is prepared to enter a stipulation regarding reliquidation, as it has done in another recent case. *See* Defs. Mot. at 30-31, ECF 39 (citing Joint Proposed Stipulation, *Auxin Solar, Inc. v. United States*, Ct. Int'l Trade No. 23-274, ECF No. 19). To the extent the Court possesses jurisdiction and holds that reliquidation is appropriate, Retractable has not shown that it would experience irreparable harm from paying the duties and then receiving reimbursement if it ultimately prevails.

B.      Retractable's Proposed Relief Would Alter The Status Quo—Thus Requiring A Heightened Showing Of Harm That Retractable Is Unable To Meet

The typical purpose of a preliminary injunction is to "maintain the status quo" until a decision on the merits can be reached. *See Belgium v. United States*, 452 F.3d 1289, 1297 (Fed. Cir. 2006) (citation omitted); *see also Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981)

3

(explaining that the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held"). Requests that would alter the status quo are disfavored and require a heightened showing to prevail. *See, e.g.*, *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (requiring a "clear showing" for a mandatory injunction that would alter the status quo) (citation omitted).

Granting Retractable's requested relief would not maintain the status quo, but instead would enable Retractable to enter millions of dollars of merchandise from China into the United States without paying applicable duties. *See* DX 23 at 1 (reflecting import quantities in recent years). Allowing Retractable to accumulate millions of dollars of unpaid duties to the United States would alter—not preserve—the status quo.

This Court has frequently addressed requests for preliminary injunctive relief in which parties seek to enter merchandise without paying cash deposits for antidumping duties. *See, e.g.*, *Shree Rama Enterprises v. United States*, 983 F. Supp. 192, 195 (Ct. Int'l Trade 1997). Like the relief requested in this case, such requests seek to alter the statutory scheme by allowing entry of merchandise into the United States without paying cash deposits or duties. The Court has declined to create a bright-line rule for establishing irreparable harm in such cases, but has made clear that "the threshold is high and will be very difficult to cross." *Id.* Retractable fails to satisfy the required standard. Not only has Retractable failed to show that it would face immediate extinction absent the requested relief, but it has numerous options available to it to mitigate any potential harm from the section 301 tariffs.

1.    Retractable Does Not Face Immediate Extinction

Retractable has not met the heightened threshold to establish irreparable harm. For example, the threshold was met in one case in which the plaintiff demonstrated that it would face

"immediate economic extinction" from paying the applicable cash deposit rates. *Id.* (citing *Queen's Flowers de Colombia v. United States* (*Queen's Flowers*), 947 F. Supp. 503, 507 (Ct. Int'l Trade 1996)). Unlike in *Queen's Flowers*, however, Retractable has not shown that it faces immediate extinction from paying the section 301 duties. To the contrary, Retractable [          ██████████████████████████ ] as a result of paying the duties. The chief financial officer, John Fort, testified that Retractable [ ████████████████████████ ] if required to pay the tariffs. Tr. 36:19-21. He agreed that Retractable would not become [ ██████████████ ████████████████████ ]. Tr. 57:5-7; *see also* Tr. 39:19-23. Project manager Mr. Lervisit agreed that the tariffs would not cause Retractable to become [ ██████████████████ ]. Tr. 157:8-12.

Instead, Retractable's witnesses testified only that it *might* face harm from the section 301 duties. For example, Mr. Fort testified that the "tariff *may* have a cascading effect on Retractable," but on the other hand, "it may not." Tr. 36:8-14 (emphasis added). This equivocation falls far short of immediate and irreparable harm.

> 2. After More Than $80 Million In Investment By The Federal Government, Retractable Has Viable Alternatives To Importing The Majority Of Its Merchandise From China

Far from risking insolvency, Retractable recently benefited from a more than $80 million investment by the Federal Government. From 2020 to 2023, the Government invested more than $80 million in Retractable's domestic manufacturing facility in Little Elm, Texas. *See* DX 23 at 3; DX 22 at 1 (other transaction agreement)[2], *see also* DX 9, ECF 27-10, DX 10, ECF 27-11 (technology investment agreement and modification). Following this investment, Retractable

---

[2] A copy of DX 22 is attached to this filing, as it has not previously been filed on the docket.

had "additional capacity" in its domestic manufacturing facilities that was unused in 2023 and 2024. Tr. 48:16-18. These domestic facilities are currently able to manufacture 1 milliliter (mL) and 3 mL syringes, as well as EasyPoint needles. Tr. 50:11-14, Tr. 51:8-10; *see also* Tr. 58:21-23, 60:7-9.

Although its domestic manufacturing facility does not currently have the ability to manufacture certain product lines—such as the 0.5 milliliter (mL) insulin syringe—Retractable anticipates that it will be able to domestically manufacture the 0.5 mL insulin syringe by May 2025. *See* Tr. 50:15-21. Retractable will not "become insolvent before May 2025 when it's able to produce the half milliliter syringes at its domestic facility." Tr. 51:11-15.

Furthermore, Retractable could have previously upgraded its domestic facilities to cover more product lines (such as the 0.5 mL insulin syringes) if it had "chosen to allocate the resources" to do so. Tr. 69:18-70:8. Yet, despite benefiting from the more than $80 million investment by the Federal Government, Retractable did not choose to make use of its new domestic capacity in this way. Instead, Retractable *reduced* staffing in its domestic facilities in 2023, and, in 2024, *increased* the percentage of merchandise that it purchased from China.

Specifically, in 2023, Retractable "used Chinese manufacturers to produce 88.4% of {its} products." DX 5 at 7. Despite having additional capacity in its domestic facility (following the investment by the Government), Retractable laid off 22 percent of its workforce in 2023. DX 5 at 5; *see also* DX 22 (reflecting the investment by the Federal Government). In 2024, Retractable increased the percentage of its Chinese imports to 91 percent of its total sales. Tr. 48:2-10. "{B}y reducing the workforce by 22 percent, those employees who had been trained up on Retractable's manufacturing capacity left the company and their training left with them." Tr. 48:19-23. Retractable's CEO testified that it takes "{p}robably a year" to train someone to be

"good at" operating the machinery. Tr. 107:21-23. Part of the current delay in ramping up domestic manufacturing is the "time to hire and train new employees." *See* Tr. 48:19-49:2; *see also* Tr. 105:23-106:11.

When choosing to lay off workers in 2023, Retractable was aware of the "potential risk of a business strategy that relied heavily on Chinese imports." Tr. 46:12-15. As described in its 2023 financial statements, Retractable was aware that relying on imports from China exposed it to "risks associated with foreign trade policy." DX 5 at 7; *see also* Tr. 46:16-47:4. Retractable recognized that "{t}rade protection measures, including tariffs, and/or changes to import or export requirements could materially adversely impact our operations." DX 5 at 7. The 2023 financial statements also foresaw the risk of "supply chain disruptions" resulting from a reliance on imports from China. Tr. 49:3-20; *see* DX 5 at 7.[3]

Retractable's CEO, Thomas Shaw, indicated that concern about the welfare of its Chinese supplier was one of the reasons for continuing to import from China rather than using Retractable's own domestic manufacturing facilities. *See* Tr. 104:19-105:11. When asked whether Retractable was "allowed to use {its} domestic manufacturing capacity," Mr. Shaw indicated that doing so would be "at the expense of ending {Retractable's} relationship with {its} 20-year partner in China that was responsible for helping out during the pandemic." Tr. 105:2-11. Mr. Shaw stated that the Chinese supplier was "screaming at {him} every night" about what they were going to do. Tr. 105:48-11.

In sum, despite having the option to utilize excess manufacturing capacity at its domestic facility—which was funded by a more than $80 million investment by the Federal

---

[3] Mr. Lervisit testified that Retractable was "on back order" due to a supply chain issue—again, one of the foreseeable risks from relying on imports from China. *See, e.g.*, Tr. 164:5-17; DX 5 at 7.

Government—Retractable instead pursued the business strategy of *increasing* its reliance on imports from China. It now seeks extraordinary injunctive relief to avoid the foreseeable consequences of its own business decisions. This does not amount to irreparable harm.

### 3. Retractable Could Reduce Executive Pay

Another option is for Retractable to reduce executive pay over the short term while absorbing the section 301 duties. Retractable projected that it would lose $4 to 6 million in 2025 even *without* paying for the tariffs. Tr. 34:24-35:4. *With* the tariffs, Retractable projected that it would face a loss "in excess of $8 million," Tr. 35:5-9—totaling approximately $2 million in losses from the tariffs. By comparison, Retractable's CEO testified that he received "{s}omewhere around 4 to 5 million" in annual compensation from Retractable. Tr. 102:4-7; *see also id.* at 102:9-11 (testifying that the current compensation is "closer maybe to 3 and a half million"). Even assuming the CEO's compensation would otherwise be $3.5 million in 2025, that leaves room to cover the estimated losses from the tariffs (approximately $2 million), while still paying the CEO $1.5 million.[4]

### 4. Retractable's Concerns About Cutting Its Product Line Do Not Establish Irreparable Harm

Retractable's witnesses indicated that Retractable could lose customers if it fails to supply the full range of products. *See, e.g.*, Tr. 99:15-19. However, this testimony does not establish irreparable harm because Retractable is not prohibited from importing merchandise from China. There is no embargo on needles and syringes from China; rather, this case challenges section 301 *duties* on syringes and needles. Not only does Retractable have the cash

---

[4] Retractable's 2023 financial statements acknowledged the "conflicts of interest" presented by Mr. Shaw's role as the controlling shareholder, the holder of Retractable's intellectual property, and the CEO. DX 5 at 7; *see also* Tr. 41:22-42:7, Tr. 42:19-43:6.

and investments to pay these duties, *see* DX 8 at 1, it also has numerous alternative options that could reduce the amount of the duties. *See* Section II.B.2. Thus, although witness testimony shows that it might be unprofitable for Retractable to cut its product line, Retractable has not shown that the section 301 tariffs would require such an outcome.

Similarly, to the extent Retractable might lose customers if it raises prices, Retractable has not shown that the imposition of section 301 duties would *require* it to raise prices. Instead, the "decision of whether to raise prices is ultimately a business judgment." Tr. 128:21-24. Retractable also has other options such as (1) reducing executive pay, (2) increasing domestic manufacturing, and (3) using cash reserves and investments to cover any losses. *See* Section II.B.1-3.

### III. Granting A Preliminary Injunction Would Be Contrary To The Public Interest

The testimony at the hearing demonstrated that Retractable does not face unique or extraordinary harm from the imposition of section 301 tariffs. To the contrary, Retractable has a strong balance sheet and a recent investment of more than $80 million by the Government. *See, e.g.*, DX 8 at 1; DX 9, DX 10, DX 22. Retractable nonetheless asks the Court to authorize it to import millions of dollars in merchandise without paying section 301 duties. Finding irreparable harm in this case would dilute the irreparable harm standard and risk opening the door to similar relief being requested by thousands of other companies impacted by the section 301 tariffs. *See In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1358 (Ct. Int'l Trade 2021) (citing "approximately 3,600 cases"). This would undercut the public interest supporting the section 301 action—namely, to obtain the elimination of China's unfair trade practices. *See, e.g.*, ECF 41-15 at 2; ECF 41-30 at 9 (explaining that the section 301 action would "incentiviz{e} China to eliminate the investigated acts, policies, and practices, and mitigate{e} possible harm to the U.S.

economy"). For these reasons—and the reasons discussed in our opposition to the preliminary injunction, ECF No. 39—the equities weigh strongly against granting Retractable's request for a preliminary injunction.

IV. <u>USCIT Rule 65(c) Security Is Required</u>

Finally, if the Court entertains Retractable's motion for a preliminary injunction, the "security" required by Rule 65(c) must account for the risk that Retractable could enter millions of dollars in merchandise during the pendency of the case and (if it loses), be unable or unwilling to pay. *See* R. Ct. Int'l Trade 65(c). As security for this risk, Retractable should be required to post a [ ▮▮▮▮▮ ] bond—and to notify the Court in advance if the value of Retractable's imports will exceed that amount.

Although we previously requested a bond of [ ▮▮▮▮▮ ] to reflect the amount that Retractable may import over the next year, this was based on Retractable's own imports as the importer of record. *See* DX 20, ¶ 10, ECF 34 (Amstutz Decl.). The evidence at the hearing demonstrated that Retractable also imported merchandise through a freight forwarder, increasing the total value of imported merchandise. *See* DX 23 at 1; Tr. 170:11-171:4, 171:23-172:6. Specifically, during the year to October 8, 2024, Retractable's records reflect that it imported [ ▮▮▮▮▮ ] from China. DX 23 at 1. Projecting that amount over one year—a reasonable estimate of the length of litigation on the merits—demonstrates that a bond of approximately [ ▮▮▮▮▮ ] is necessary security in this case.

## **CONCLUSION**

For these reasons, and the reasons set forth in the motion to dismiss and opposition to the motion for preliminary injunction, ECF Nos. 39, 41, we respectfully request that the Court dismiss the complaint and deny Retractable's motion for a preliminary injunction.

OF COUNSEL

MEGAN M. GRIMBALL
PHILIP A. BUTLER
Office of the United States Trade
Representative


EMMA L. TINER
International Trade Litigation
Office of the Assistant Chief Counsel
U.S. Customs and Border Protection


October 22, 2024

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

EMMA E. BOND
Senior Trial Counsel
U.S. Department of Justice, Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-2034
Email: Emma.E.Bond@usdoj.gov

*Attorneys for Defendants*